NOTEMAN et al. v. WELCH, Collector.
No. 3491.

Circuit Court of Appeals, First Circuit.
Dec. 22, 1939.

Richard W. Hale, of Boston, Mass. (Raymond B. Roberts and Hale & Dorr, all of Boston, Mass., on the brief), for appellants.

Robert N. Anderson, Sp. Asst. to the Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key and Arthur A. Armstrong, Sp. Assts. to the Atty. Gen., on the brief), for appellee.

Jackson R. Collins, of New York City, amicus curiae.

Before WILSON and MAGRUDER, Circuit Judges, and PETERS, District Judge.

MAGRUDER, Circuit Judge.

Plaintiffs are trustees of a Massachusetts trust (hereafter referred to as the taxpayer), engaged in the business of making loans under the provisions of the Massachusetts "Small Loans Act."[1] The taxpayer seeks in the present action to recover refunds of corporate surtaxes, additions, and interest collected from it for the taxable year ending September 30, 1935. These sums were assessed by the Commissioner as a result of his determination that the taxpayer fell within the provisions of Section 351 of the Revenue Act of 1934,[2] which reads, in part, as follows:

"Surtax on personal holding companies

"(a) Imposition of tax. There shall be levied, collected, and paid, for each taxable year, upon the undistributed adjusted net income of every personal holding company a surtax equal to the sum of the following:

"(1) 30 per centum of the amount thereof not in excess of $100,000; plus

---

[1] Mass.G.L.(1932) c. 140, § 96 et seq.

[2] 48 Stat. 751, 26 U.S.C. § 331 (1934), 26 U.S.C.A. § 331.

"(2) 40 per centum of the amount thereof in excess of $100,000.

"(b) Definitions. As used in this title [subchapter]—

"(1) The term 'personal holding company' means any corporation (other than a corporation exempt from taxation under section 101 [103], and other than a bank or trust company incorporated under the laws of the United States or of any State or Territory, a substantial part of whose busi-ness is the receipt of deposits, and other than a life-insurance company or surety company) if—(A) at least 80 per centum of its gross income for the taxable year is derived from royalties, dividends, interest, annuities, and (except in the case of regular dealers in stock or securities) gains from the sale of stock or securities, and (B) at any time during the last half of the taxable year more than 50 per centum in value of its outstanding stock is owned, directly or indirectly, by or for not more than five individuals."

It was conceded that during the taxable year "more than 50 per centum in value" of the taxpayer's outstanding stock "was owned, directly or indirectly, by or for not more than five individuals". In this appeal from the District Court's decision (26 F. Supp. 437), granting judgment for the Collector, the taxpayer contends that the court should have found, on the evidence, that more than 20 per cent of the taxpayer's gross income, which consisted solely of ·payments received from borrowers, represented charges for expenses incident to making, servicing and collecting the loans, and that payments by the borrowers attributable to these items are to be differentiated from "interest"; hence that the taxpayer was not a personal holding company within the statutory definition. Further, the taxpayer contends that, even if the Commissioner was right in determining the deficiencies and imposing the surtaxes, the

penalties or additions for failure to file returns on Form 1120-H were imposed without authority of law.

Section 351 of the Act of 1934 was aimed at tax avoidance by the scheme of the "incorporated pocketbook", described by a subcommittee of the House Ways 'and Means Committee as follows: "That is, an individual forms a corporation and exchanges for its stock his personal holdings in stocks, bonds, or other income-producing property. By this means the income from the property pays corporation tax, but no surtax is paid by the individual if the income is not distributed."[3] Small loan companies did not present a typical instance of the abuse thus described. Indeed, we cannot find from an examination of the legislative history that either the Congress or its committees considered the possible effect of the pending legislation upon companies engaged in the business of making small loans.

This, of course, does not necessarily mean that such companies are exempt from the tax imposed by Section 351. It not infrequently happens that legislative bodies, with specific instances of abuse in mind, phrase tax legislation in such broad terms as to include persons or groups of persons not specifically contemplated. The alternative is over-particularization, which may lend itself to evasion by clever changes of form or method. In the present instance it was pointed out at the committee hearings that the term "personal holding company" was so broadly defined that legitimate operating companies might be subjected to its provisions.[4] However, the House was unwilling to make specific exemptions except for banks and insurance companies.[5] The Senate restricted somewhat the application of these two exemptions, but in response to the urgings of representatives of the real estate business eliminated the word "rents" from the Section.[6] The committee

---

[3] Preliminary Report on the Prevention of Tax Avoidance, 73d Cong., 2d Sess. (House Committee on Ways and Means, Dec. 4, 1933), p. 6. The recommendation of this subcommittee was the basis of legislation subsequently introduced.

[4] For instance, see Hearings on Revenue Revision, 1934, before the House Committee on Ways and Means, 73d Cong., 2d Sess., Dec. 15–21, 1933, and Jan. 9–11, 1934, pp. 53–56, 293, 295, 392. See Hearings before the Senate Committee on Finance on H.R. 7835, 73d Cong.,

2d Sess., Mar. 12–15, 1934, pp. 2, 57, 84, 92, 112–13, 160–61, 162, 165, 166–67, 170–74. See also the Statement of the Acting Secretary of the Treasury (Henry Morgenthau, Jr.) regarding the Preliminary Report on the Prevention of Tax Avoidance (1933), p. 8.

[5] Section 102(b) of draft of H.R. 7835 (73d Cong., 2d Sess.), as introduced into the Senate on Feb. 20 (calendar day, Feb. 22), 1934, p. 54, lines 8–9.

[6] Section 351(b) of H.R. 7835, as passed by the Senate on March 28 (calendar day, April 13), 1934, p. 203, line 17.

reports in both the House and the Senate, taking note of the objection that the language of the bill might include some bona fide operating companies which were not formed for any purpose of tax evasion, said that the bill would work no real hardship upon any corporation except one that was being used to reduce the surtaxes of its stockholders, because the corporation "can always escape this tax by distributing to its stockholders at least 90 per cent of its adjusted net income."[7] Section 351 as finally passed and approved on May 10, 1934, followed the Senate version.

Legislative developments subsequent to 1934 are significant.

During the course of the 1935 hearings on revenue revision before the Senate Finance Committee, Mr. Ellsworth C. Alvord, representing the American Association of Personal Finance Companies (of which the taxpayer is a member), submitted a memorandum[8] in which it was stated that the gross income of personal finance companies was probably in the nature of "interest", within the meaning of Section 351, and hence that it was desirable that Congress should relieve these companies from the burden imposed by Section 351. Despite this plea, the definition of personal holding company remained unaltered in the Revenue Act of 1935,[9] nor was any such change made by the 1936 Act. 49 Stat. 1732, § 351. In the Revenue Act of 1937, we find a slight alteration—"personal holding company income" is defined to include "rents, unless constituting 50 per centum or more of the gross income. For the purposes of this subsection the term 'rents' means compensation, however designated, for the use of, or right to use, property

* * *." 50 Stat. 814, § 353.[10] In H. R. 9682, as introduced into the House March 1, 1938, Section 351 was renumbered Sections 401–406. Section 403(g) amended the definition of "rents" but contained no reference to personal finance companies. However, on March 8, 1938, the following amendment to Section 402(b) was offered and agreed to on the floor of the House[11] without any debate whatsoever: "The term 'personal holding company' does not include * * * a licensed personal finance company, under State supervision, at least 80 per centum of the gross income of which is lawful interest received from individuals each of whose indebtedness to such company did not at any time during the taxable year exceed $300 in principal amount, if such interest is not payable in advance or compounded and is computed only on unpaid balances."

The bill was passed in this form by the House. The Senate Committee Report[12] contains no reference to the exception made in favor of personal finance companies. This exception was contained in the Revenue Act of 1938, as finally enacted.[13]

The taxpayer seems to regard the 1938 amendment favoring personal finance companies as being in the nature of a "clarification" designed to prevent the courts from misconstruing Section 351 of the Act of 1934. But the 1938 amendment excepts a personal finance company only if certain specified conditions are met: The company must be licensed; it must be operated under state supervision; at least 80 per cent of its gross income must be "lawful interest"; such "lawful interest" must be received from individuals each of whose indebtedness to the company did not at any

---

[7] H.Rep. 704, 73d Cong., 2d Sess. (House Committee on Ways and Means, Feb. 12, 1934) p. 12; Sen.Rep. 558, 73d Cong., 2d Sess. (Senate Committee on Finance, March 28, 1934), p. 15. As finally enacted, § 351(b)(2) provides that "undistributed adjusted net income", upon which the surtax is imposed, shall be computed by subtracting from the "adjusted net income": "20 per centum of the excess of the adjusted net income over the amount of dividends received from personal holding companies which are allowable as a deduction for the purposes of the tax imposed by section 13 or 204;

"(B) * * *

"(C) Dividends paid during the taxable year."

On these provisions, see 5 Paul and Mertens, Law of Federal Income Taxation, § 48.41.

[8] Hearings before Senate Committee on Finance on H.R. 8974 (74th Cong., 1st Sess.), July 30–31 and Aug. 1, 2, 6, 7, 8, 1935, p. 347.

[9] 49 Stat. 1020, § 109 (1935).

[10] H.Rep. 1546 (Committee on Ways and Means), 75th Cong., 1st Sess., Aug. 13, 1937, p. 6; and Sen.Rep. 1242 (Committee on Finance) 75th Cong., 1st Sess., Aug. 16, 1937, p. 8, contain explanation.

[11] 83 Cong.Rec. 3073 (March 8, 1938).

[12] Sen.Rep. 1567, 75th Cong., 3d Sess., April 5, 1938.

[13] 52 Stat. 557, § 402(b), 26 U.S.C. § 332(b), Supp.1938, 26 U.S.C.A. § 332(b).

time during the taxable year exceed $300 in principal amount; and in addition, such interest must neither be payable in advance nor compounded and must be computed only on unpaid balances. Manifestly, we cannot read into the 1934 act the detailed provisions of the 1938 act with reference to personal finance companies. On the other hand, if the Act of 1934 were construed as not covering any personal finance companies, they would obtain a broader exemption under the earlier act than they now enjoy under the Act of 1938, a conclusion wholly at variance with the legislative history.

In our opinion, therefore, Section 351 of the Act of 1934 cannot be construed to exempt personal finance companies, as such, even though they may be legitimate operating companies, formed for no purpose of tax evasion. Such a company must be held to be covered if at least 80 per centum of its gross income for the taxable year is derived from "interest" and if (as is the case with the taxpayer before us) more than 50 per centum in value of its outstanding stock is owned, directly or indirectly, by or for not more than five individuals.

The gross income of the taxpayer consisted entirely of payments by borrowers. The taxpayer to recover in this suit must establish by a preponderance of evidence that over 20 per cent of such payments was for something other than "interest" within the meaning of Section 351. Reinecke v. Spalding, 280 U.S. 227, 232–233, 50 S.Ct. 96, 74 L.Ed. 385.

"Interest" is not defined in the statute. Article 351–2(3) of Regulations 86, promulgated under the Revenue Act of 1934, provides that "as used in Section 351, the term 'interest' means any amounts received for the use of borrowed money which are includible in gross income under Title I." The taxpayer's gross receipts were of course includible in gross income under Title I. Ordinarily it is immaterial whether an item concededly within gross income is returned as "interest" or simply as "other income". Therefore, the question whether the gross receipts here were "received for the use of borrowed money"—which is only another way of stating the ultimate question for decision—would remain unanswered, even if the taxpayer had returned its gross receipts as "interest". That the present taxpayer returned its entire gross income for the purposes of the ordinary tax as a single item—"interest and charges for small industrial loans", a characterization not contained on the printed form—is certainly not decisive.

Enforcement of the earlier usury laws was largely thwarted by the ingenuity of lenders in exacting from borrowers, in addition to lawful interest, other sums variously described as commissions, fees, charges for services and expenses. Sometimes these extra charges were legitimately for a consideration other than the use of borrowed money. Thus in Snow v. Nye, 106 Mass. 413, a lender who did not have ready cash agreed to sell certain stock and lend the proceeds to the borrower, who agreed to pay (1) a lawful rate of interest on the loan 'and (2) any appreciation there might be on the market value of the stock during the period of the loan. This contract was held not to be usurious, because the extra contingent payment was in consideration of the lender's having foregone the chance of profit from a rise in the market. Accord, Joffe v. Bonn, 3 Cir., 1926, 14 F.2d 50. Likewise in In re Mesibovsky, 2 Cir., 1912, 200 F. 562, 563, the lender, in addition to the 6 per cent legal interest, charged the borrower 2 per cent for actual services in assuming the burden of collecting accounts assigned by the borrower as security. The court held that this charge was not a cloak for usury, pointing out that "If this work had not been done by the lender, it would necessarily have been done by the borrower, and would have cost money". But in many cases, the added charges have been condemned as subterfuges. In re Fishel, 2 Cir., 198 F. 464; Home Bond Co. v. McChesney, 239 U.S. 568, 36 S.Ct. 170, 60 L.Ed. 444; Cooper v. Ross, 1925, 232 Mich. 548, 556, 205 N.W. 592; Haines v. Commercial Mortgage Co., 200 Cal. 609, 616, 617, 254 P. 956, 255 P. 805, 53 A.L.R. 725; In re Prince, 2 Cir., 1937, 89 F.2d 681. In the last cited case, a "service charge" was held usurious where the lender did not collect the assigned accounts but an auditor employed by the lender was detailed to check up on collections by the borrower. The court pointed out (89 F.2d page 682) that this charge was for the benefit of the lender, not the borrower, and said:

"Although, under the terms of the written agreement, the lender might have collected the accounts, he did not do so and the services rendered by the auditor and

others of his staff were in watching the collateral and otherwise safeguarding his loan. In that respect the services differed from those for which compensation has been allowed by courts to lenders such as for examination of title preliminary to making loans, for actually collecting pledged accounts and for work of attorneys in enforcing collections under agreements. Security Mortgage Co. v. Powers, 278 U.S. 149,.49 S.Ct. 84, 73 L.Ed. 236; In re Gotham Can Co., C.C.A., 48 F.2d 540, 542. In the case at bar the service charge was continuous from the time when the loan was made and was in fact a charge by the lender only 'for a service he renders to himself.' Commercial Security Co. v. Holcombe, 262 F. 657, 662, C.C.A. 5. Agreements to pay more than the legal rate of interest, though in form for services rendered, have been treated as usurious under circumstances such as we find here. Home Bond Co. v. McChesney, 239 U.S. 568, 36 S.Ct. 170, 60 L.Ed. 444; Commercial Security Co. v. Holcombe, 262 F. 657, C.C.A. 5; Grannis v. Stevens, 216 N.Y. 583, 111 N.E. 263; Quackenbos v. Sayer, 62 N.Y. 344. Such cases as Houghton v. Burden, 228 U.S. 161, 33 S.Ct. 491, 57 L.Ed. 780, and In re Mesibovsky, C.C.A., 200 F. 562, where actual services were performed by the lender at an agreed rate of compensation in excess of legal interest are distinguishable."

To obviate all quibbling as to extra charges claimed by the lender to be for something other than the use of borrowed money, the present Massachusetts statute, under which the taxpayer operates, authorizes the Commissioner of Banks, in respect to loans of $300 or less, to prescribe an over-all charge "for interest and expenses", not to exceed 3 per cent a month, to be paid by the borrower; beyond this, "no charge, bonus, fee, expense or demand of any nature whatsoever" may be exacted from the borrower in connection with the loan.[14] Under this statute the Commissioner of Banks does not have to segregate the permissible exaction into "pure interest" for the use of borrowed money, and charges for added services performed for the benefit of the borrower. The Regulations of the Commissioner, applicable during the taxable year now in question, prescribed, in the case of unsecured loans and loans secured by chattel mortgages, that "the total amount to be paid on any loan for interest and expenses shall not exceed 3 per cent a month on the amount actually received by the borrower, computed on unpaid monthly balances."

The Deputy Commissioner of Banks testified at length as to the method of arriving at this rate of 3 per cent a month. He pointed out that the operating expenses of the small loan business are necessarily high, and that the Commissioner, in fixing the rate, considered that 2 per cent a month would roughly cover the whole operating expense, except taxes, and the additional 1 per cent would afford to personal finance companies a fair and reasonable profit. This means no more than that the aggregate charge is reasonable, not that two-thirds of it is for something other than the use of borrowed money.

In its corporation income tax return, Form 1120, the taxpayer reported $104,514 as its gross income from payments by borrowers. As total deductions for expenses it claimed $61,808.50. The taxpayer put into the record an allocation of these expenses under seven headings: (1) Investigation of Borrower and Security, (2) Closing of Loans, Papers, etc., (3) Servicing and Collecting Loans, (4) License & Reports to State Banking Department & Public Relations, (5) Advertising to Secure Loans, (6) Bad Debts, and (7) General Expenses. It cannot be seriously contended that the last four headings represented services to the borrower warranting a separable charge in addition to that for the use of borrowed money. See In re Prince, supra. In the printed form of promissory note which

---

14 Mass.G.L.1932, c. 140, §§ 96–114. Sec. 100 reads: "He [The Commissioner] shall establish the rate of interest to be collected, and in fixing said rate shall have due regard to the amount of the loan, and the nature of the security, and the time for which the loan is made; but the total amount to be paid on any loan for interest and expenses shall not in the aggregate exceed an amount equivalent to three per cent a month on the amount actually received by the borrower, computed on unpaid balances; and no licensee or company or association to which sections ninety-six to one hundred and twelve, inclusive, apply shall charge or receive upon any loan a greater rate of interest than that fixed by the commissioner. No charge, bonus, fee, expense or demand of any nature whatsoever, except as above provided, shall be made upon loans to which said sections relate."

borrowers are required to execute, the statement is made that of the charge of 3 per cent a month "approximately one per cent is for interest; and approximately two per cent is for expenses as defined in Massachusetts General Laws, chapter 140, Section 100." This statement is contrary to fact if it means anything more than the testimony of the Deputy Commissioner of Banks, previously referred to.

But it is urged that the first three headings in the above allocation of expenses more directly relate to the cost of making, servicing and collecting of loans, and that these items at least, totalling $28,645.76, or more than 20 per cent of the gross income, should not be considered as charges for interest. Distributed over these three items are the salaries of the manager and the other employees, depreciation of office furniture and equipment, stationery supplies, travelling expenses, legal fees, postage, telephone and telegraph, rent paid by the taxpayer for offices, and two-thirds of a management fee of $14,742 paid to the National Supervising & Audit Bureau, Inc., for supplying general credit information as "to what classes of persons loans should or should not be made", for keeping a record of the "progress of loans", and "jacking up the Boston office on bad accounts". This Bureau during the taxable year was a subsidiary of Industrial Bankers Securities Corporation, the parent company, which also owns the present taxpayer, the National Loan Society of Boston.

In large part these charges are for services the lender renders, not to the borrower; but to himself, in deciding whether to make the loan, and in safeguarding the loan after it is made. An example of this is an item in what is called "servicing the loan", consisting of the overhead expense of receiving and recording payments by the borrower. Under the authority of In re Prince, supra, the trial judge could not have found that of the gross amount paid by the borrowers this sum of $28,645.76 in its entirety was for charges other than interest.

We recognize that some state courts in construing their usury laws have held that payments exacted of a borrower for expenses of the lender in connection with the loan are not to be considered compensation for the use of the borrowed money. Pushee v. Johnson, 123 Fla. 305, 166 So. 847, 105 A.L.R. 789; Lassman v. Jacobson, 125 Minn. 218, 146 N.W. 350,

51 L.R.A.,N.S., 465, Ann.Cas.1915C, 774; Hatcher v. Union Trust Co., 174 Minn. 241, 219 N.W. 76; Williston, Contracts, Rev.Ed. § 1694. Note, Usury—Deduction of Expenses Incidental to the Loan, 10 N.Car.L.Rev. 403. Courts here were seeking to mitigate what they deemed to be the undue rigors of some usury laws, and in straining to this end may have sometimes defeated the purpose of the legislatures by introducing a connotation to the term "interest" not given in common parlance. But even if we should make the doubtful assumption that this restrictive interpretation of "interest" in certain usury cases is controlling on the meaning of that word in Section 351 of the Revenue Act of 1934, this would not help the taxpayer in the present case. There is the further difficulty that the charge for expenses in this case is a blanket charge assessed against all borrowers, whether or not the enumerated services are rendered to the particular borrower, and whether or not the enumerated expenses are incurred in connection with any particular loan. See In re Fishel, supra; Mortgage Securities Corp. v. Levy, 5 Cir., 1926, 11 F.2d 270, 272. For instance, the item of $8,619.47 for "Investigation of Borrower and Security" is given as the expense of investigating all applicants, though on the average loans are made only to four out of seven investigated. Thus, the actual borrowers bear the overhead expense of investigating rejected applicants. So, the expense of investigating security is spread over all borrowers, including those who borrow without security. Again, the large item of $18,156.04 for "Servicing and Collecting Loans" includes an unspecified amount for the overhead expenses of rewriting loans on different terms for borrowers unable to meet payments originally agreed upon, and an unspecified amount for the expense of answering inquiries by borrowers; these expenses are spread over all borrowers, whether or not their particular loans had to be rewritten, and whether or not they took up the time of the office force with inquiries. More striking are the sizable sums allocated for expenses of pursuing delinquent debtors—travelling expense and salaries of investigators and collectors, legal fees, postage, telephone calls, etc. "It is our policy never to let a skip get away if it is humanly possible to prevent it", testified the president of the company. These collection

costs, like losses for bad debts, obviously do not represent services or expenses in connection with loans to borrowers who are not delinquent; yet they are charged to all borrowers in the undifferentiated item of 2 per cent a month "for expenses".

In other words, responsible borrowers have to pay more for the use of the money borrowed—more interest—in order to enable the lender to absorb the overhead costs of investigating rejected applicants, rewriting loans for borrowers in difficulties, pursuing "skips", and writing off bad debts; just as an honest insured has to pay more for his insurance so that the insurance company can absorb the cost of fighting dishonest claims.

■ The Supreme Court in Old Colony Railroad Co. v. Commissioner, 284 U.S. 552, 560, 561, 52 S.Ct. 211, 214, 76 L.Ed. 484, said: "And as respects 'interest,' the usual import of the term is the amount which one has contracted to pay for the use of borrowed money. * * * We cannot believe that Congress used the word having in mind any concept other than the usual, ordinary, and everyday meaning of the term * * *." A borrower has no interest in the rent which the finance company pays for its offices, in the cost of its office supplies, in the management fees which it pays to an affiliate, in the salaries of its employees, in the cost of its advertising, or in its losses for bad debts, except as those operating expenses require the finance company to charge the borrower more for the use of the money borrowed. Ordinary banks have similar overhead expenses in making loans. Yet the full rate charged by banks would in ordinary usage be regarded as "interest", and the borrower in making out his own income tax return could deduct it from his gross income under Section 23(b) of the Revenue Act of 1934, 26 U.S.C.A. § 23(b), as "interest paid or accrued within the taxable year on indebtedness". Judging from the description of the taxpayer's business in the record it seems that the only real consideration which the ordinary small borrower receives is the use of the money, and certainly, from his point of view, that is what he pays for. Apparently such a borrower would ordinarily be entitled under Section 23(b) to deduct from his own gross income the full 3 per cent as "interest paid," if, as we think is clear, borrowers from a bank can make a similar deduction, for the contract of loan does not assign any specific portion of the payments to particular charges properly separable from interest. See Old Colony Railroad Co. v. Commissioner, supra. Presumably "interest" is used in Section 351 in the same sense as in Section 23(b). In fact, Section 351(b) (4) provides that "the terms used in this section shall have the same meaning as when used in Title I [Subchapters A–C of this chapter]."

It is not without significance that the taxpayer itself sometimes speaks of the whole charge as interest, as in its printed form of receipt, and in its record-filing card. The whole charge is similarly characterized in the uniform small loan law adopted in many states.[15] The Federal Credit Union Act, 48 Stat. 1216, 12 U.S.C. § 1751 et seq., 12 U.S.C.A. § 1751 et seq., which was enacted by Congress a few weeks after the passage of the Revenue Act of 1934, authorized the credit unions to make loans "at rates of interest not exceeding 1 per centum per month on unpaid balances (inclusive of all charges incident to making the loan)". Congress had used similar language in enacting the so-called loan shark law for the District of Columbia, 37 Stat. 657 D.C.Code 1929, T. 17, § 21 et seq., upheld in Reagan v. District of Columbia, 41 App.D.C. 409.[16]

One final point is to be noted as to the meaning of "interest" in Section 351. As previously stated, the personal finance companies procured in 1938 an amendment partially exempting them from the operation of the surtax on personal holding companies. The sections of the Revenue Act of 1938 dealing with this surtax have an arrangement different from that of Section 351 in the Act of 1934. The portions

---

[15] Cf. the provisions of the state statutes collected in Camalier, Personal Finance Laws, 1938 Ed.

[16] That statute provides in Section 5: "That no such person, firm, voluntary association, joint-stock company, incorporated society, or corporation shall charge or receive a greater rate of interest upon any loan made by him or it than one per centum per month on the actual amount of the loan, and this charge shall cover all fees, expenses, demands, and services of every character, including notarial and recording fees and charges, except upon the foreclosure of the security."

of the 1938 Act now relevant are copied in the footnote.[17]

Personal finance companies are by Section 402(b) of the 1938 Act not exempted from the definition of personal holding company unless at least 80 per cent of their gross income is "lawful interest". Certainly no one, least of all the present taxpayer, will argue that the word "interest", as used in Section 402(b), does not include all the payments by borrowers. If the word "interest" in the 1938 exception clause were to be given the restrictive meaning which the taxpayer argues should be given to the same word as it appears in Section 351 of the 1934 Act, then the taxpayer could not, under its own theory, take advantage of the 1938 exception. The 1938 counterpart of Section 351 is Section 403, defining "personal holding company income". If "interest" in Section 351 is given the narrow construction urged by the taxpayer, it would seem to follow that "interest" in Section 403 would have to be given the same narrow construction. "Interest", then, would have one meaning in Section 403 for the purpose of defining personal holding company income and quite another meaning in Section 402(b) for the purpose of defining personal holding company. It is difficult to believe that Congress intended the same word, undefined in the act, to have different meanings in two contiguous sections.

We do not say, in concluding on this branch of the case, that all payments by borrowers from licensed personal finance companies are necessarily "interest" under the Massachusetts Small Loans law, or under Section 351 of the Revenue Act of 1934. If the loan contract calls for payments by delinquent borrowers for extra expenses of collection resulting from their own default, such payments would not be called interest. Williams v. Flowers, 1890, 90 Ala. 136, 7 So. 439, 24 Am.St.Rep. 772. If accounts receivable are pledged as security for the loan, an extra payment to the lender for actual services of collecting the accounts would not be called interest. In re Mesibovsky, supra. Nothing of this sort appears in the case at bar, for the taxpayer "takes nothing as security but a plain note or a few chattels". Perhaps notarial and recording fees for chattel mortgages, if required to be paid by the borrower, might be regarded as a charge separable from interest, Lassman v. Jacobson, 125 Minn. 218, 146 N.W. 350, 51 L.R.A.,N.S., 465, Ann.Cas.1915C, 774; but chattel mortgages when taken by the present taxpayer were seldom if

---

[17] "Title IA—Personal Holding Companies.

"Sec. 401. Surtax On Personal Holding Companies.

"There shall be levied, collected, and paid, for each taxable year, upon the undistributed Title IA net income of every personal holding company (in addition to the taxes imposed by Title I) a surtax equal to the sum of the following:

"(1) 65 per centum of the amount thereof not in excess of $2,000; plus

"(2) 75 per centum of the amount thereof in excess of $2,000.

"Sec. 402. Definition Of Personal Holding Company.

"(a) General Rule.—For the purposes of this title, and Title I, the term 'personal holding company' means any corporation if—

"(1) Gross income requirement.—At least 80 per centum of its gross income for the taxable year is personal holding company income as defined in section 403; * * * and

"(2) Stock ownership requirement.—At any time during the last half of the taxable year more than 50 per centum in value of its outstanding stock is owned, directly or indirectly, by or for not more than five individuals.

"(b) Exceptions.—The term 'personal holding company' does not include a corporation exempt from taxation under section 101, a bank as defined in section 104, a life insurance company, a surety company, a foreign personal holding company as defined in section 331, or a licensed personal finance company, under State supervision, at least 80 per centum of the gross income of which is lawful interest received from individuals each of whose indebtedness to such company did not at any time during the taxable year exceed $300 in principal amount, if such interest is not payable in advance or compounded and is computed only on unpaid balances.

"(c) * * *

"Sec. 403. Personal Holding Company Income.

"For the purposes of this title the term 'personal holding company income' means the portion of the gross income which consists of:

"(a) Dividends, interest (other than interest constituting rent as defined in subsection (g) ), royalties (other than mineral, oil, or gas royalties), annuities." 52 Stat. 557, 558, 26 U.S.C.A. §§ 331–333.

ever notarized or recorded. Other illustrations need not be given now.

▆ What we do say is that on the present record the taxpayer has failed to sustain the burden of proving that over 20 per cent of its gross income was derived from sources other than interest. The trial judge could not have so found on the evidence. The taxpayer is therefore not entitled to judgment for recovery of the surtax.

An incidental question remains. The Commissioner assessed a 25 per cent addition for failure of the taxpayer to file a separate return on Form 1120-H as required by Article 351-8 of Regulations 86. Section 351(c) of the Revenue Act of 1934 incorporates in Title IA, dealing with the surtax on personal holding companies, the administrative provisions (including penalties) applicable in respect to taxes imposed by Title I. This brings us back to Section 291 of the Revenue Act of 1934, 26 U.S.C.A. § 291, which reads in part as follows:

"Sec. [§] 291. Failure to file return. In case of any failure to make and file a return required by this title [chapter], within the time prescribed by law or prescribed by the Commissioner in pursuance of law, 25 per centum of the tax shall be added to the tax, except that when a return is filed after such time and it is shown that the failure to file it was due to reasonable cause and not due to willful neglect no such addition shall be made to the tax."

Section 406 of the Revenue Act of 1935[18] does not affect the present case; all it does is to soften the penalty where a return is filed not more than 120 days late.

▆▆ No return was ever filed by the taxpayer on Form 1120-H. A return was duly filed on Form 1120, in which the taxpayer answered "no" to the question: "Is the Corporation a personal holding company within the meaning of Section 351 of the Revenue Act of 1934?" This return did not contain a full disclosure of the relevant facts, for it did not indicate that more than 50 per cent in value of the outstanding stock was owned by not more than five individuals, nor did it indicate the taxpayer's claim as to what percentage of its income from borrowers was attributable to "interest". The Commissioner has consistently ruled, under Section 291 of the 1934 Act, and comparable provisions in other acts, that unless the taxpayer files a return, although tardy, he cannot be excused from the statutory penalty, however reasonable may have been the cause of his delinquency. Article 1211, Reg. 77 (1932 Act); Article 291-1, Reg. 86 (1934 Act); Article 291-1, Reg. 94 (1936 Act); Article 291-1, Reg. 101 (1938 Act). No other interpretation of Section 291 seems permissible. Where a required return is never filed by the taxpayer, it is mandatory that the additions be imposed, as has been held in a case involving failure to file this very return, Form 1120-H. Collateral Mortgage & Investment Co. v. Commissioner, 1938, 37 B.T.A. 630. See also Scranton, Lackawanna Trust Co. v. Commissioner, 1934, 29 B.T.A. 698, affirmed 3 Cir., 1935, 80 F.2d 519, certiorari denied, 1936, 297 U.S. 723, 56 S.Ct. 669, 80 L.Ed. 1006; National Contracting Co. v. Commissioner, 8 Cir., 1939, 105 F.2d 488; Edmonds v. Commissioner, 9 Cir., 1937, 90 F.2d 14 (estate tax); Fidelity & Columbia Trust Co. v. Commissioner, 6 Cir., 1937, 90 F.2d 219.

▆ All in all, the taxpayer makes out an appealing case, but mindful of the limits of our judicial function we cannot save the taxpayer from an exaction which Congress required of it by the Act of 1934, and from which Congress relieved it in 1938, for the future but not retroactively. Cf. Foley Securities Corp. v. Commissioner, 8 Cir., 1939, 106 F.2d 731, 734.

The judgment of the District Court is affirmed.

[18] 49 Stat. 1027, 26 U.S.C. § 1525 (Supp.1938), 26 U.S.C.A. § 1525: "Sec. 406. Failure to file returns. * * * In the case of a failure to make and file an internal-revenue tax return required by law, within the time prescribed by law or prescribed by the Commissioner in pursuance of law, if the last date so prescribed for filing the return is after the date of the enactment of this Act [August 30, 1935], if a 25 per centum addition to the tax is prescribed by existing law, then there shall be added to the tax, in lieu of such 25 per centum: 5 per centum if the failure is for not more than 30 days, with an additional 5 per centum for each additional 30 days or fraction thereof during which failure continues, not to exceed 25 per centum in the aggregate."