GIRARD INV. CO. v. COMMISSIONER OF INTERNAL REVENUE.

No. 7696.

Circuit Court of Appeals, Third Circuit.

Aug. 22, 1941.

Jackson R. Collins, of New York City, and James D. McHugh and Frank F. Truscott, both of Philadelphia, Pa. (Robert I. Staples, of Philadelphia, Pa., and Reginald H. Smith, Jr., of New York City, on the brief), for petitioner.

Louise Foster, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before BIGGS, MARIS, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

This is a second attempt to construe away the effect of some quite unambiguous language. We say second because now one more closely held small loan company seeks to avoid the application of the "incorporated pocketbook" provision of the Revenue Act of 1934.[1] In the first case[2] the First Circuit Court of Appeals, in an able opinion by its presiding judge, refused relief. Learned counsel, who argued as amicus curiae in that case, may have given and no doubt has given some polish to his earlier contentions. They are, however, in essence the same and, we think, should receive the reception previously accorded. Counsel maintained then and now: first, that the return charged for the use of money loaned in small amounts is not in-

terest; second, that the plain and specific words of the Act are overridden by a general intention not to apply them to operating companies; and third, that a subsequent amendment is clarifying rather than altering.

The petitioner's interpretation of interest seems to us a curious one. It is unnecessary to set down the depressing history of the small loan industry. It seems to be a discouraging example of human cupidity.[3] We had occasion to note it in a recent opinion.[4] The regulation of these companies turns on what rate of interest is excessive and so usurious.[5] The authors of the Encyclopædia of the Social Sciences define "interest" as follows:

"Interest in its primary meaning is the payment for the use of money. * * * In theoretical analysis it is generally taken to mean a 'pure' remuneration for the use of money, or yield on money capital; *pure* interest is deduced from *nominal* interest by elimination of all elements imputable to cost or effort of administration, to insecurity of payment of interest or principal, to prospective changes in the purchasing power of money and to amortization necessary to maintain the principal intact." 8 Encyclopædia of the Social Sciences 131 (Italics ours).

With many small loans to the kind of people who need small sums the "effort of administration" and the "insecurity of payment" is more pronounced. The small loan companies have advocated and been granted rates covering this increased cost and risk. It is a non sequitur to use this justifiable excess in nominal interest as an

---

[1] "The term 'personal holding company' means any corporation (other than a corporation exempt from taxation under section 101, and other than a bank or trust company incorporated under the laws of the United States or of any State or Territory, a substantial part of whose business is the receipt of deposits, and other than a life-insurance company or surety company) if—(A) at least 80 per centum of its gross income for the taxable year is derived from royalties, dividends, *interest*, annuities, and (except in the case of regular dealers in stock or securities) gains from the sale of stock or securities, and (B) at any time during the last half of the taxable year more than 50 per centum in value of its outstanding stock is owned, directly or indirectly, by or for not more than five individuals. * * * "

26 U.S.C.A.Internal Revenue Act of 1934, § 351(b) (1), page 757 (italics ours).
See, also, 26 U.S.C.A.Internal Revenue Act of 1936, § 351(b) (1), page 936.

[2] Noteman v. Welch, 108 F.2d 206.

[3] Combatting the Loan Sharks, 8 Law and Contemporary Problems; Nugent and Robinson, Regulation of the Small Loan Business; Neifeld, Personal Finance Business; Neifeld, Personal Finance Comes of Age; Gallert, Hilborn & May, Small Loan Legislation 53; Thorp, Watson & Wilson, The Law of Money Lending (London, 1928).

[4] Stein v. Delano, Waldron v. Delano, 3 Cir., June 30, 1941, 121 F.2d 975.

[5] Horack, A Survey of the General Usury Laws, 8 Laws and Contemporary Problems 36; Collins, Evasion and Avoidance of Usury Laws, 8 Law and Contemporary Problems 54.

argument in support of its own exclusion from the general word interest and the limitation of that word to *pure* interest.

The "general intention" versus "specific language" theory has this basis. The incorporated pocketbook became a quite scandalous device for tax avoidance.[6] The recipient of a large income incorporated himself and so took advantage of legal ghost lore.[7] In the average case the person thus desiring taxwise invisibility was of the "rentier" class. Undoubtedly that most usual instance was predominantly in the legislative mind. That is not to say, however, that the Congress approved any individuals paying the low corporate rates on what was in substance individual income. Such an approval would be to import into our law the English distinction between earned and unearned income.[8] Because that is the only difference between the incorporation of income from your investments and the incorporation of income from the operation of your business, small loan or otherwise.[9] We think, therefore, that petitioner has failed to bring his case within the "occasions when words may be interpolated."[10] This may be done only

[6] "Perhaps the most prevalent form of tax avoidance practiced by individuals with large incomes is the scheme of the 'incorporated pocketbook.' That is, an individual forms a corporation and exchanges for its stock his personal holdings in stocks, bonds, or other income-producing property. By this means the income from the property pays corporation tax, but no surtax is paid by the individual if the income is not distributed." H.Rept. 704, Ways and Means Committee, 73d Cong., 2nd Sess., 1934, p. 11.

See, also, S.Rept. 558, Finance Committee, 73d Cong., 2nd Sess., 1934, p. 13. For discussions of the use of the personal holding company for tax avoidance see Paul, The Background of the Revenue Act of 1937, 5 University of Chicago Law Review 41, 49–69; Jacobson and Johnson, Minimizing Income and Estates Taxes: The Family Trust, The Family Corporation and The Family Partnership, 5 Brooklyn Law Review 389, 402–410; 5 Paul and Mertens, Law of Federal Income Taxation § 48.38; Tyler and Ohl, The Revenue Act of 1934, 83 University of Pennsylvania Law Review 607, 608–612; The Federal Revenue Act of 1936, 85 University of Pennsylvania Law Review 83, 84. It has been said that the Act failed to accomplish its purpose. See Paul and Mertens, Law of Federal Income Taxation (Supp.1939), § 48.43A; Martin, Taxation of Undistributed Corporate Profits, 35 Michigan Law Review 44. But cf: "The subcommittee believes that Title 1A (§ 351) has worked well and efficiently in those cases to which it is applicable." Report of a Subcommittee of the Committee on Ways and Means, 75th Cong., 1938, on a Proposed Revision of the Revenue Laws, p. 21. See, also, Rudick, Section 102 and the Personal Holding Company Provisions of the Internal Revenue Code, 49 Yale Law Journal 171, 175–177.

[7] "The bill endeavors to reach a very prevalent form of tax avoidance which has been practiced for years by individuals with large incomes who form corporations which hold their personal income-producing property. This permits the collection of the corporate tax upon the income from his property and avoids such income from paying the surtax which would have been imposed upon it, had the income from said property been received by the individual rather than the corporation.

"To illustrate, a man with a million-dollar annual income from taxable bonds under existing law would pay $571,100. However, if a holding company was organized to take title to such bonds or other property, the corporation would receive the income, whereupon the old tax would be the corporate tax of $137,500, as long as no dividends were distributed. In this way, a tax saving of $433,600 is readily seen." 78 Cong.Rec. 2608.

[8] 8 & 9 Geo. V, c. 40, Income Tax Act of 1918, § 14(3); Konstam, The Law of Income Tax, 8th Ed., pp. 15–17; Pratt and Redman's Income Tax Law, 10th Ed., 34, 171, 172.

[9] See Dean, Decadence of the Corporate Devise As a Means of Avoiding Surtax on Individuals, 15 Temple Law Review 65, 81.

[10] "As a general rule * * * courts have no power to add to, or to change, alter or eliminate the words which the legislature has incorporated in a statute, not even in order to provide for certain contingencies which the legislature failed to meet, or to avoid hardship flowing from the language used, or to advance the remedy of the statute.

"There are, however, some occasions when words may be interpolated. * * * It is plainly proper for the courts to supply evident inadvertent legislative omission by the interpolation of words necessary to complete the sense of the statute and to harmonize it with the obvious legislative intent." Crawford, Statutory Construction, pp. 345, 346.

when the statutory language is equivocal[11] or where literal interpretation leads to absurdity "so gross as to shock the general moral or common sense."[12]

■ If the existing is obscure anything subsequent can be interpreted either as a clarification or as a change. If the former, the effect is retrospective and therefore to be eschewed. It can, of course, be so stated and if it is, governs. One might prescribe this the sine qua non. In any event, caution has been indicated:

"Statutory construction is often aided by a consideration of later enactments which may clarify doubt as to the meaning of the earlier statute or correct manifest error in its administration.[13] No rule of construction needs more careful application. Ordinarily, the deliberate selection of language differing from the language of previous acts indicates an intended change of the law. But no change may be intended; the later statute may be declaratory of the meaning of the previous law or a codification, or recognition of a contemporaneous construction, crystallizing it into statutory law; it may be a clarification of an earlier act. On the other hand, a later statute may be intended to supplant an earlier act rather than as an elucidation of it. * * * Above all, the courts may not apply later acts to a period prior to their adoption by assuming that they supply inadvertent omissions. This, of course, is but another way of saying that statutes must be given a prospective application if a contrary intention does not clearly appear, and that the function of the courts is judicial, not legislative." 1 Paul and Mertens, Law of Federal Income Taxation, § 3.15, pp. 46, 47.

Certainly a three years' rejection of the later language betokens a change. We hesitate to alter but hasten to explain. In 1935,[14] 1936[15] and 1937,[16] a plea for exemption was unsuccessfully pressed. In preparing the Revenue Act of 1936, the House bill omitted Section 351 entirely. The Senate Finance Committee rewrote the section and attempted to specifically exempt small loan companies. This insertion in the provision was eliminated by the Conference Committee.[17] Finally in 1938 counsel for a body of which the petitioner was a member was persuasive.[18] Personal finance companies that met certain specified conditions were exempted.[19] But the amendment of 1938 is to be given no retroactive effect.[20]

---

[11] See 1 Paul and Mertens, Law of Federal Income Taxation § 3.03. As one might expect, the law has a Latin maxim: Cum in verbes nulla ambiguitas est, non debet admitti voluntatis quæstio.

[12] Crooks v. Harrelson, 282 U.S. 55, 60, 51 S.Ct. 49, 50, 75 L.Ed. 156; 1 Paul and Mertens above cited, §§ 3.04, 3.05. For a collection of cases wherein intent prevailed over literal language, see Statutes-Statutory Interpretation, 21 Georgetown Law Journal 77.

[13] Cf., the words of Mr. Justice Brandeis in discussing the effect of an attempted change in the tax law subsequent to the law he was probing: "No aid could possibly be derived from the legislative history of another act passed nearly six years after the one in question." Penn Mutual Life Ins. Co. v. Lederer, 252 U.S. 523, 538, 40 S.Ct. 397, 402, 64 L.Ed. 698.

[14] Hearings before Committee on Finance, 74th Cong., 1st Sess., 1935, on H.R. 8974, pp. 347–356.

[15] Hearings before Committee on Ways and Means, 74th Cong., 2d Sess., 1936, on H.R. 12395, pp. 357–369.

[16] Hearings before Committee on Ways and Means, 75th Cong., 1st Sess., 1937, on Tax Evasion and Avoidance, pp. 108–126.

[17] Sen. Report 2156 on Revenue Act of 1936, 74th Cong., 2d Sess., p. 24.

[18] Hearings before the Committee on Ways and Means, 75th Cong., 3d Sess., on Revenue Revision of 1938, pp. 541–558.

[19] "Section 402(b) (Revenue Act of 1938) relieves personal finance companies of the burden imposed by the surtax on personal holding companies. This relief was much needed as it was impractical for many companies to continue in operation under the burden of this tax, and many of the personal finance companies deemed it impractical for them to reorganize so as not to be classed as a personal holding company; as it is necessary in some instances to keep the control of such an enterprise in the hands of only a few individuals to insure successful operation in this highly specialized field of finance." Jones, The Revenue Act of 1938—Changes in the Federal Tax Program, 16 Tax Magazine 323, 370.

[20] See Crawford, Statutory Construction, §§ 277, 295, 306; 2 Sutherland, Statutory Construction (Lewis' Ed. 1904) §§ 641, 642; 59 C. J. Statutes § 692; 1 Paul and Mertens, Law of Federal Income Taxation § 3.25; Smead, The Rule Against Retroactive Legislation; A Basic Principle of Jurisprudence, 20 Minne-

The petitioner also resists the imposition of a 25 per cent penalty for failure to file a separate return on Form 1120 H as required by Article 351-8 of Regulations 86. Section 351(c) of the Revenue Act of 1934 incorporates the administrative provisions (including penalties) applicable in respect to the tax imposed by that section. One of those administrative provisions reads:

"In case of any failure to make and file a return required by this title, within the time prescribed by law or prescribed by the Commissioner in pursuance of law, 25 per centum of the tax shall be added to the tax, except that when a return is filed after such time and it is shown that the failure to file it was due to *reasonable cause* and not due to willful neglect no such addition shall be made to the tax. * * *" 26 U.S.C.A. Internal Revenue Act of 1934, § 291, page 750. (Italics ours.)[21]

Petitioner's taxes for 1934, 1935 and 1936 were returned on Form 1120. This Form is entitled "Corporation Income and Excess-Profits Tax Return." The fourth question at the top of this return reads: "Is the Corporation a Personal Holding Company Within the Meaning of Section 351 of the Revenue Act of 1934? ...... (If so, an additional return on Form 1120 H must be filed.)" Petitioner answered the question in the negative and so did not disclose either its stock ownership or the percentage of its gross income from interest. In the space provided for remarks on page 2 of this Form, we find the following:

"The Girard Investment Co. is in business to make loans up to $300.00. It is an operating company charging a flat rate fixed by the Legislature of Penna. to cover examination fees, investigation fees, service charges incidental to operating the business. We are therefore of the opinion that the company is not a personal holding company." Exhibit C, Appendix to Petitioner's brief, p. 60.

The return was prepared by a firm of accountants, Snyder and McAlpine. On June 3, 1939, and two years after the last of these Forms 1120 were filed, petitioner made his return on Form 1120 H, "Return of Personal Holding Company." This was done at the suggestion of the revenue agent concerned.

We agree with the respondent that the filing of Form 1120 does not constitute a sufficient return.[22] The information therein contained is clearly not adequate. Petitioner fails to mention that the case on which he relies[23] is under an earlier Act[24] which contains much the broader phraseology "In case of any failure to make and file a return *or list* * * *."[25] That being so, we must determine, first, whether the penalty is mandatory and second, if it is not mandatory whether the facts disclose "reasonable cause" for the failure to file. Since there was ultimately a correct return, the very words of the statute preclude any mandatory impact. The principal case falls within the facts of Edmonds v. Commissioner,[26] Sabatini v. Commissioner,[27] and Plunkett v. Commissioner,[28] rather than Helvering v. Boekman[29] and Noteman v. Welch.[30] It is interesting, perhaps, to observe that the harsh language of the 1934 Act[31] has since been modified.[32]

The burden of establishing reasonable cause is on the taxpayer.[33] The rule as to "reasonable cause" has been well stated by a leading authority:

"Obviously, ignorance of the necessity of filing a return does not of itself relieve the taxpayer of the 25% penalty. Nevertheless, the fact that 'every man is presumed to know the law' hardly justifies the imposition of the penalty. A more

---

sota Law Review 775; Statutes—Effect on Cause of Action Accruing Prior to Amendment Curing Constitutional Defect In Previous Statute, 78 University of Pennsylvania Law Review 275.

[21] See, also, 26 U.S.C.A. Internal Revenue Act of 1936, § 291, page 920.

[22] 5 Paul and Mertens, Law of Federal Income Taxation § 48.14.

[23] Hartford-Connecticut Trust Co. v. Eaton, 2 Cir., 34 F.2d 128.

[24] Rev.Stat. § 3176, as amended by § 1317 of the Revenue Act of 1918, 40 Stat. 1147.

[25] Italics ours.

[26] 9 Cir., 90 F.2d 14.

[27] 2 Cir., 98 F.2d 753.

[28] 1 Cir., 118 F.2d 644.

[29] 2 Cir., 107 F.2d 388.

[30] 1 Cir., 108 F.2d 206.

[31] 26 U.S.C.A. Internal Revenue Act of 1934 § 291, page 757.

[32] 26 U.S.C.A. Internal Revenue Code § 291.

[33] Sabatini v. Commissioner, 2 Cir., 98 F.2d 753; West Side Tennis Club v. Commissioner, 2 Cir., 111 F.2d 6.

satisfactory reason would be that the penalty is directed to some extent against such delinquents. Efficient administration of the Act demands that some penalty be imposed. Where, however, the ignorance of the necessity of filing the return or the belief that no return was due is supported by a reasonable cause, the penalty will not be imposed. Here our test of 'ordinary business prudence' is applicable.

"Where taxpayers have been delinquent in the filing of a return because of a belief that no return was due, frequently they have been fortified in this belief by the advice of counsel or of accountants. The question arises as to whether this advice is sufficient to constitute reasonable cause for the delinquency. If the taxpayer consulted a lawyer or accountant and upon the presentation of the full information in his possession was advised that no return was necessary, a sufficient showing of 'reasonable cause' for the delinquency has been made. In such instances the taxpayer undoubtedly exercised 'ordinary business prudence.' Where, however, the taxpayer in consulting his lawyer or accountant failed to furnish him with complete information and withheld facts the existence of which would make a return necessary, the advice that no return was necessary obviously furnishes no grounds for relief from the 25% penalty. The taxpayer must act in good faith." Klein, Federal Income Taxation 1674.[34]

The remarks included on the return prepared by petitioner's accountant[35] incline us to the belief that it has satisfied the requirements of the rule. The returns were filed long before counsel for petitioner's association's legislative efforts to have the bill amended.[36] The somewhat inadequate condition of the record suggests, however, that in fairness the case should be remanded for further proof with respect to the imposition of the penalty.

The decision of the Board of Tax Appeals is reversed and the cause is remanded for further proceedings in accordance with this opinion.

---

[34] 5 Paul and Mertens, Law of Federal Income Taxation § 48.15; Dayton Bronze Bearing Co. v. Gilligan, 6 Cir., 281 F. 709; Commissioner v. S. A. Woods Machine Co., 1 Cir., 57 F.2d 635; Louisville Provision Co. v. Glenn, D.C., 18 F.Supp. 423.

[35] Quoted above.

[36] See Hearings Before Committee on Ways and Means, 74th Cong., 2d Sess., 1936 on H.R. 12395, pp. 357–369.