COMMISSIONER OF INTERNAL REVENUE v. SUN PIPE LINE CO.

SAME v. PIERMONT CORPORATION.

Nos. 7784, 7832.

Circuit Court of Appeals, Third Circuit.

Argued Nov. 19, 1941.

Decided March 23, 1942.

Arthur A. Armstrong, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and J. Louis Monarch, and Helen R. Carloss, Sp. Assts., to Atty. Gen., on the brief), for petitioner.

John Blair Moffett, of Philadelphia, Pa., (Henry A. Frye, of Philadelphia, Pa., on the brief), for respondent in No. 7784.

Francis L. Casey, of New York City (Walter S. Orr and White & Case, both of New York City, on the brief), for respondent in No. 7832.

Before CLARK and JONES, Circuit Judges, and GIBSON, District Judge.

CLARK, W., Circuit Judge.

The taxpayers are personal holding companies incorporated in Delaware. Prior to January 1, 1934 Piermont Corporation owed the First National Bank of New York $1,162,561.25. Foreseeing the consequences of a sudden calling of this demand loan, Piermont replaced the obligation with twenty-year debentures issued as of January 1, 1934. At the close of 1934 a sinking fund for the retirement of the debentures was established and a reserve of $50,000 set up for this purpose. Another $50,000 was added to the reserve in 1935. As of January 1, 1934 Sun Pipe Line Company had outstanding debentures aggregating $3,500,000. These bonds were refunded in 1934 at a saving of 1½ per cent in the interest rate. In 1937 $3,400,000 of the refunded bonds was retired. In filing their income tax returns both taxpayers took credits, Piermont for the amount set aside in 1935 and Sun Pipe Line for $67,045.49 of the amount of the retirement. The applicable statute provides that such a credit shall be allowed in computing undistributed adjusted net income (upon which the personal holding company surtax is based) for[1] "Amounts used or set aside to retire indebtedness incurred prior to January 1, 1934, if such amounts are reasonable with

---

[1] The amended version of the statute applicable to the deduction claimed by Sun Pipe Line is substantially the same:

"Amounts used or irrevocably set aside to pay or to retire indebtedness of any kind incurred prior to January 1, 1934,

reference to the size and terms of such indebtedness."[2]

The Commissioner disallowed the deduction in both cases on the ground that the indebtedness was not incurred prior to January 1, 1934. The taxpayers thereupon prevailed upon the Board of Tax Appeals to reverse the Commissioner and this decision[3] is now on appeal. The single issue then is: Does a refunding operation undertaken subsequent to January 1, 1934 come within the meaning of the word "indebtness" in the statute? The Treasury by regulation[4] says it does not. They insist that only in a renewal is the deduction permissible. The Board of Tax Appeals exhibit here, at least, less of the spirit of Zaccheus.[5] They emphasize the amount rather than the parties. If the amount has not changed, the personalities of the obligees are irrelevant in their view.

We think this must be so. Certainly as a matter of English, indebtedness has no reference to anything but amount. One is just as much obligated and it hurts just as much to pay one's bank as one's baker. It is the contract, not the parties who are bound by it, that matters. The term has been defined as an obligation to pay or perform[6] and is synonymous with owing.[7] Nowhere do the cases stress to whom.[8] It would require then some clearly expressed Congressional intent to justify us in finding a special meaning.

Far from finding any such legislative purpose the exact contrary seems to be true. As is known,[9] the primary purpose of Section 351 of the 1934 Act was to force the distribution of income of personal holding companies to their stockholders.[10] The latter would then become liable to surtax on such income at rates which are higher than that imposed upon corporate income.[11] But at the same time Congress wished to allow personal holding companies to make a reasonable accumulation for legitimate cor-

if such amounts are reasonable with reference to the size and terms of such indebtedness." Revenue Act of 1936 § 355 (b) as amended by § 1 of the Revenue Act of 1937, 26 U.S.C.A.Int.Rev.Code, § 504.

[2] Revenue Act of 1934, § 351(b) (2) (B), 26 U.S.C.A.Int.Rev.Acts, page 758.

[3] Petitioner's brief (Piermont) p. 17; Petitioner's brief (Sun Pipe Line) p. 29.

[4] "An indebtedness evidenced by bonds, notes, or other obligations issued by a corporation is ordinarily incurred as of the date such obligations are issued and the amount of such indebtedness is the amount represented by the face value of the obligations. In the case of renewal or other changes in the form of an indebtedness, so long as the relationship of debtor and creditor continues between the taxpayer and his creditor, the giving of a new promise to pay by the taxpayer will not have the effect of changing the date the indebtedness was incurred. * * * " Treasury Regulation 94, as amended by T.D. 4791. Art. 355-2, 1938-1, Cum.Bul. 83, 108.

See also Art. 351-4 of Reg. 86, as amended by T.D. 4777, 1937-2 Cum.Bull. 196 for similar regulation applicable to earlier statute in question in Piermont case.

[5] "War involves in its progress such a train of unforeseen and unsupposed circumstances that no human wisdom can calculate the end. It has but one thing certain, and that is to increase taxes." Thomas Paine, Prospects on the Rubicon.

"Cursed war and racking tax

Have left us scarcely raiment to our backs."

Sir Walter Scott, The Search after Happiness, Stanza 16.

[6] 20 Words and Phrases, Perm.Ed., p. 657.

[7] 20 Words and Phrases, Perm.Ed., p. 657.

[8] Aetna Life Ins. Co. v. Lyon County, C.C., 82 F. 929; City of Huron v. Second Ward Sav. Bank, 8 Cir., 86 F. 272, 49 L.R.A. 534; City of Los Angeles v. Teed, 112 Cal. 319, 44 P. 580; City of Poughkeepsie v. Quintard, 136 N.Y. 275, 32 N. E. 764. Cf. District Township of Doon v. Cummins, 142 U.S. 366, 12 S.Ct. 220, 35 L.Ed. 1044 (cases dealing with constitutional or statutory limitations upon the indebtedness which may be incurred by a municipal corporation). See also 20 Words and Phrases, Perm.Ed., pp. 645–657.

[9] See our discussion in Girard Investment Co. v. Com'r, 3 Cir., 122 F.2d 843.

[10] See Report of the Joint Comm. on Tax Evasion and Avoidance, 75th Cong., 1st Sess. (1937), p. 2.

[11] "Many will consider the surtax imposed on these personal holding companies a harsh measure. However, a corporation which falls within this section because of the nature of its business and the number of its stockholders can always escape this tax by distributing to its stockholders at least 90 percent of its adjusted net income. The stockholder will, of course, be subject to the graduated surtaxes upon such distributions. Thus, the section should work no real hardship upon any corporation except one

porate purposes.[12] A reserve created to pay off existing obligations was recognized as such a purpose and therefore a deduction from net income for these reserves was permitted. The appropriate Committees said:

"Considerable hardship has been avoided by permitting the deduction from the adjusted net income of a reasonable amount used or set aside to retire indebtedness incurred prior to January 1, 1934. This will substantially and properly relieve personally owned corporations which have outstanding bonds or other indebtedness that must be met from current earnings before distributions can be made." Senate Finance Comm., S.Rept. No. 558, 73d Cong., 2nd Sess., p. 15.

"The denial of this deduction would cause hardship in numerous cases where, due to the particular circumstances of the corporation, a dividend distribution can not be made because of a necessity for legal reasons of using the earnings and profits to discharge the debts. Moreover, any loss of revenue caused by the continued allowance of this deduction can not increase, since indebtedness incurred after 1933 can not be used as a basis for the deduction. No corporation can be formed for the purpose of taking advantage of this deduction. Furthermore it is inevitable that the revenue loss must decrease as pre-1934 debts are retired." Ways and Means Comm., H.Rept. 1546, 75th Cong., 1st Sess., pp. 10-11.

From these reports it is plain that the date, January 1, 1934, was selected to prevent incorporated pocketbooks from being formed after the passage of the Act to take advantage of its provisions. "Indebtedness incurred" after that date were the words chosen rather than "personal holding companies incorporated" after the date in order to prevent those corporations already in existence from building up fictitious debt structures for which they might later set up reserves. So far as existing debt structures were concerned, Congress was resigned to the fact that it would be forced to permit tax free reserves to be accumulated for their liquidation. It was willing to let a deduction be taken by those corporations which fell within the Act to the extent of their existing debt structure. Congress was more interested in "indebtedness" as an amount rather than as a reference to specific contracts. In those cases where the deduction could have been taken but was not, there appears to have been no intent to prevent the deduction subsequent to a refund.

We are aware and have discussed[13] the somewhat complicated law that has grown up around Treasury Regulations. In a recent article Professor Schuck has well summarized the rather confusing conditions that surround it:

"The courts, awake to the need for stability in the law and flexibility in the administrative process, have, by exercising judicial restraint, given certain interpretative regulations a measure of protection. Thus, if the basis statute is ambiguous as to the portion interpreted;[14] if the administrative interpretation has been consistently adhered to by the administrative body;[15] if the interpretation is of long standing;[16] if it has been impliedly approved or ratified[17] by Congress through reenactment of the statutory provision without substantial change;[18] if the interpretation is not 'unreasonable'[19]—if all these conditions are present in some degree—the court will generally recognize the validity of the interpretation." Schuck, Supreme Court of the United States, 28 Georgetown Law Journal 364, 366-368.

As we have found the Congressional intent so plain the law indicated does not seem to be applicable. Even if it were, only one of the conditions of the learned Professor is fulfilled in the present case.

---

which is being used to reduce surtaxes upon its shareholders." Senate Finance Comm. Rept. No. 558, 73d Cong., 2nd Sess., p. 15.

[12] See Tyler and Ohl, The Revenue Act of 1934, 83 University of Pennsylvania Law Review 607, 610.

[13] Com'r v. Textile Mills Sec. Corp., 3 Cir., 117 F.2d 62, at page 74.

[14] Koshland v. Helvering, 298 U.S. 441, 446, 56 S.Ct. 767, 80 L.Ed. 1268, 105 A. L.R. 756.

[15] Burnet v. Chicago Portrait Co., 285 U.S. 1, 16, 52 S.Ct. 275, 76 L.Ed. 587.

[16] United States v. Shreveport Grain & Elevator Co., 287 U.S. 77, 84, 53 S.Ct. 42, 77 L.Ed. 175; Iselin v. United States, 270 U.S. 245, 46 S.Ct. 248, 70 L.Ed. 566; Hesslein v. Hoey, 2 Cir., 91 F.2d 954.

[17] United States v. Arredondo, 6 Pet. 691, 713, 8 L.Ed. 547.

[18] Morrissey v. Com'r, 296 U.S. 344, 355, 56 S.Ct. 289, 80 L.Ed. 263.

[19] Manhattan General Equipment Co. v. Com'r, 297 U.S. 129, 134, 56 S.Ct. 397, 80 L.Ed. 528. Textile Mills Security Corp. v. Com'r, Dec. 8, 1941, 62 S.Ct. 272, 86 L.Ed. ——.

As is usually true, the administrative interpretation has been consistently adhered to by the administrative body. The interpretation however has not had a long continued application.[20] It is presumed that an interpretative regulation of long continued standing must have come to the attention of Congress. If Congress does not amend the Act, it is because it has accepted the administrative construction.[21] We do not believe that four years is a sufficiently long continued usage where the first two cases to raise the point before the Board of Tax Appeals are those we are now hearing on appeal.[22] In such circumstances the silent acquiescence of Congress may not be presumed, since legislative knowledge of the regulations appears too doubtful.

■ The doctrine of statutory incorporation of a prior administrative ruling by reenactment without change is founded upon the belief, however fictitious,[23] that the members of Congress had some knowledge of the prior ruling. Where, as here, no positive proof of such knowledge exists, it might be presumed when the regulation has been in effect for some time. The presumption is here impossible, however, because the regulations had been in effect but three and five months respectively when Congress enacted the Revenue Act of 1938.[24] In the only case in point that we have been able to find, the presumption was denied although the regulation had been in existence for over eight months.[25] We therefore attach no weight to the reenactment. Nor do we believe that the Treasury's interpretation is reasonable for the reasons we have given in our discussion of indebtedness.

■ The Commissioner makes a final argument in the Sun Pipe Line case. He contends that the amounts from adjusted net income in 1937 for the retirement of the bond issue was not "reasonable with reference to the size and terms of such indebtedness."[26] The maturity of the bond issue was staggered over the period from 1935 to 1940. Although $3,400,000 face amount of bonds was retired in 1937, only $67,045.49 of the adjusted net income was used for this purpose. In view of the fact that $400,000 face amount of bonds matured in 1937, deduction for the amounts paid from adjusted net income to the extent of $67,045.49 was certainly not unreasonable.

The decisions of the Board of Tax Appeals are affirmed.

JONES, Circuit Judge (concurring).

With the construction which the majority of the court place upon the respective sections of the Revenue Acts involved in these cases and with the further conclusions that the relevant Treasury Regulations exceed their proper administrative province and have not received congressional approval either direct or implied, I am in agreement and therefore note my concurrence in the result. But, as I believe the rule relating to implied congressional approval has an important place in the law under appropriate circumstances, certain expressions in the discussion for the majority cause me to withhold a general concurrence.

---

[20] See Griswold, A Summary of the Regulations Problem, 54 Harvard Law Review 398, 408 et seq.

[21] The dangers of this presumption are indicated by Feller, Addendum to the Regulations Problem, 54 Harvard Law Review 1311, 1314.

[22] Regulations in effect for one year have been held of too "recent adoption" to be more than "entitled to respect." Hesslein v. Hoey, 91 F.2d 954, 956.

[23] Paul, Studies in Federal Taxation (3d Series) 420–468; Alvord, Treasury Regulations and the Wilshire Case, 40 Columbia Law Review 252; Surrey, The Scope and Effect of Treasury Regulations Under the Income, Estate, and Gift Taxes, 88 University of Pennsylvania Law Review 556; Magill, The Supreme Court on Federal Taxation, 8 University of Chicago Law Review 1, 11–12; Brown, Regulations, Reenactment and the Revenue Acts, 54 Harvard Law Review 377;

Griswold, A Summary of the Regulations Problem, 54 Harvard Law Review 398 and Postscription, 54 Harvard Law Review 1323; Feller, Addendum to the Regulations Problem, 54 Harvard Law Review 1311; Implied Legislative Sanction of Treasury Regulation, 33 Illinois Law Review 468; Judicial Review of Regulations and Rulings Under the Revenue Acts, 52 Harvard Law Review 1163.

[24] The regulations were adopted on November 19, 1937 and January 14, 1938. The House of Representatives passed the Revenue Act of 1938 on March 11, 1938 and the Senate followed on April 9, 1938, 26 U.S.C.A.Int.Rev.Acts, page 995 et seq.

[25] Casey v. Sterling Cider Co., 294 Fed. 426, 429; see also Iselin v. U. S., 270 U.S. 245, 251.

[26] Section 355(b) of the Revenue Act of 1936, as amended by Section 1 of the Revenue Act of 1937.