## FREDERICK SMITH ENTERPRISE CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 10578.

Circuit Court of Appeals, Sixth Circuit.

April 12, 1948.

---

[17] Barbarino v. Stanhope SS. Co., 2 Cir., 151 F.2d 553, 555; Kreste v. United States, supra, 2 Cir., 158 F.2d 575, 577.

[18] 2 Cir., 162 F.2d 32.

A. Longstreet Heiskell, of Memphis, Tenn. (A. Longstreet Heiskell, of Memphis, Tenn., on the brief; Chandler, Shepherd, Heiskell & Williams, of Memphis, Tenn., of counsel), for petitioner.

S. Dee Hanson, of Washington, D. C. (Theron L. Caudle, Sewall Key, Lee A. Jackson and Abbott M. Sellers, all of Washington, D. C., on the brief), for respondent.

Before HICKS, SIMONS and MILLER, Circuit Judges.

SIMONS, Circuit Judge.

The basic question on this appeal is whether the petitioner was a personal holding company in the years 1937, 1939 and 1940, and this depends upon whether certain of its gains are to be classified as rents so as to preclude its classification as a personal holding company. This in turn depends upon whether specific amendments to the Internal Revenue Code, made in 1937, are to be given a literal reading or are to be construed in the light of the Congressional purpose in enacting them.

By Title 26 U.S.C.A.Int.Rev.Code, § 501, a personal holding company is defined as any corporation at least 80% of whose gross income is personal holding company income as defined in § 502. By the terms of § 502, 26 U.S.C.A.Int.Rev.Code, § 502, personal holding company income means the portion of gross income which consists of various gains, and pursuant to subsection (g), including rents unless such rents constitute 50% or more of gross income. Rents mean "compensation, however designated, for the use of, or right to use, property, * * *" but does not include amounts constituting personal holding company income under subsection (f). Turning back to subsection (f) to see what is excluded from the classification of rents under subsection (g), we find that the excluded gains are "amounts received as compensation (however designated and from whomsoever received) for the use of, or right to use, property of the corporation in any case where, at any time during the taxable year, 25 per centum or more in value of the outstanding stock of the corporation is owned, directly or indirectly, by or for an individual entitled to the use of the property; whether such right is obtained directly from the corporation or by means of a sublease or other arrangement.".

If we may be so bold as to undertake a solution to the Chinese puzzle presented by these interrelated subsections, it would seem to be this: 1, A corporation, 80% of whose income consists of dividends, interest, royalties, annuities and other specified gains, is normally a personal holding corporation; 2, In computing personal holding company income to determine whether it constitutes 80% of gross income, rents are also to be considered unless they constitute 50 or more percent of the gross income; 3, But this is subject to the condition that if the rents are for the use of cor-

porate property by a stockholder directly or indirectly owning 25% or more of the outstanding stock of the corporation, the amount he pays as compensation for the use of the property is not to be characterized as rent in determining whether total rent constitutes 50% or more of gross income. Otherwise, and still more simply put, perhaps, a tax-paying corporation whose gains consist of holding company income, including rents, to the extent of 80% of gross income, is not a personal holding company if the rents constitute 50% or more of its income over and above any compensation for the use of the corporate property received from a stockholder owning 25% of its stock. And to understand the problem posed by this appeal, these interrelated provisions must be kept clearly in mind.

We come, then, to the taxpayer's status in the years involved. It had been organized as a Delaware Corporation in 1935, for the purpose of purchasing, leasing, exchanging, developing, improving, mortgaging, pledging, selling or otherwise turning to account any land or buildings in the State of Delaware or elsewhere. The date of its incorporation was August 24th, and its incorporators were Frederick Smith, his brother Earl W. Smith, and his sister Ollie R. Barron, who, during the taxable years, at all times owned more than 50% of the petitioner's capital stock. Within a few days after the petitioner's incorporation, it acquired certain properties including a tract known as the Matagorda Plantation, for which Frederick Smith had been negotiating for some time. On November 12, 1935, the petitioner leased the Matagorda Plantation to the partnership of Smith and Moss, Smith being the president of the petitioning corporation and Moss a practical farmer. The partnership was dissolved on August 1, 1937, by Moss surrendering to Smith all his rights to the porperty in cancellation of an indebtedness. The rental provided by the lease was $13,000 a year, held by the Tax Court to be a fair and reasonable rental for the Plantation in 1937. It is conceded that Smith was a stockholder of the petitioner owning more than 25% of its stock during the period here involved.

The petitioner filed no personal holding company returns for the tax years. The Commissioner, in 1946, waiver of limitation having previously been given, asserted deficiencies in the petitioner's tax returns for 1937, 1939 and 1940 on the ground that it was a personal holding company and therefore liable for the personal holding company surtax imposed by § 500 of the Internal Revenue Code, 26 U.S.C.A.Int.Rev.Code, § 500. He also imposed a penalty which was remitted by the Tax Court and is not here involved. The Tax Court redetermined the deficiencies.

In the petitioner's several returns for the tax years, it included in the item "rent" the amounts received for the use and occupancy of the Matagorda Plantation, and, if these amounts were rightly included, total rents constituted 50% or more of its gross income. The petitioner was, therefore, not a holding company unless some appreciable part of its gains, classified as rents, was rightly excluded from such classification by the Commissioner pursuant to §§ 502(f) and (g), since the remaining rents were not, in any of the tax years, in excess of 50% of gross income.

The petitioner concedes, as necessarily it must, that if §§ 502(f) and (g) are to be literally applied the income from its Matagorda Plantation is not to be classified as rent. It insists, however, that it is a corporation not organized for the purpose of avoiding taxes, but with a legitimate business purpose; that the legislative history of the 1937 amendments clearly indicates that the intent of the Congress in enacting them was to reach specific ingenious devices for avoiding high taxes which had come to be designated by the generic term "incorporated pocket-book," and that it was not in that classification. It points to its charter which authorizes it generally to deal in real estate; to the fact that while it leased the Matagorda Plaintation to a 25% stockholder, it was at a rental found by the Tax Court to be reasonable; to the fact that it acquired other properties which were offered for sale generally to customers, and to sales of properties actually made in the tax years and the years following. It points to adjudications wherein, at the instance of the taxing authority, enactments not equivocal were given broad construction because of the intended scope of the legisla-

tion. It urges inferentially, at least, that the specific phrasing of the amendments was due to lack of Congressional foresight rather than deliberation. The Tax Court rejected these contentions. It was not able to see that the treatment accorded by the statute to rents received from a stockholder, justified their limitation to excessive or inadequate payments in compensation for the use of corporate property. It concluded that the possibilities of manipulation between controlled corporations and their stockholders, upon which the attention of Congress was concentrated, are too broad in scope to permit the purpose of the sections to be secured by confining their application to unreasonable rentals.

The history and purpose of the 1937 amendments are somewhat detailed by Mr. Randolph Paul in "The Background of the Revenue Act of 1937," 5 University of Chicago Law Review, 41 et seq. From this and other text-writers, and a consideration of the legislative history of the 1937 Act, it appears that the Treasury had brought to the attention of the President who, in turn, brought to the attention of the Congress, that a number of schemes were being used by ingenious taxpayers to avoid their share of the tax burden, and that legislation should be enacted to plug the loopholes. A Joint Committee on Tax Evasion and Avoidance was set up and held extended hearings. It was there pointed out that wealthy men were incorporating their hobbies, yachts, country estates, farms and even residences, turning over to the corporation, in addition to such properties, income producing securities. The physical property would then be leased to the original owner at an amount less than the cost of up-keep. This amount, however, would be kept high enough so that it constituted more than 20% of the corporation's gross income, to remove it from the personal holding company classification under the provisions of existing statutes. Instances were cited of corporations organized for the purpose of holding title to yachts, residences, racing stables, breeding farms and country estates, so as to permit the heavy losses upon their operations to be deducted as corporate business expense, and the device came to be characterized as the "in-corporated pocket-book." The Joint Committee made recommendations for amendment which were adopted by the Congress and incorporated into the 1937 amendments. The Commissioner's regulations doubtless took color from the discussions in Congress. In Regulation 111, § 29.502-1, it was said: "The property [as the term is used in § 502(f)] may consist of a yacht, a city residence, a country house or any other kind of property." This led text-writers to infer that § 502 was intended to reach situations where private property was incorporated for the purpose of avoiding taxes. See Mertens, 7 Law Federal Income Taxation, § 39.07, page 97.

It is no doubt true that courts in recent years have not felt bound slavishly to apply the literal phrasing of statutes when the clearly indicated purpose of the Congress would seem to require a broader or a narrower interpretation. Cabell v. Markan, 2 Cir., 148 F.2d 737; Carlisle v. Com'r, 6 Cir., 165 F.2d 645; Federal Deposit Ins. Corporation v. Tremaine, 2 Cir., 133 F.2d 827; United States v. Dickerson, 310 U.S. 554, 60 S.Ct. 1034, 84 L.Ed. 1356. Indeed, the doctrine recently has been restated in Chicago Air Lines v. Waterman Steamship Corporation, 333 U.S. 103, 68 S.Ct. 431.

It must be axiomatic, however, that a taxpayer, upon whom rests the burden to show the invalidity of a tax on the ground that he is not subject to it because he is expressly or impliedly in an excepted class, must bring himself clearly within the excepted class by proofs which compel or persuade that he is excluded. The present taxpayer says that it was incorporated to conduct a legitimate business enterprise, and that the Matagorda transaction was in furtherance of such purpose. It so alleged in its petition for review, but the respondent traversed the averment. There is no finding, however, upon this issue, nor does the record indicate that one was sought. The Tax Court was undoubtedly of the view that the business purpose of the corporation or that of its specific activities, had no bearing upon the problem involved, and that whether incorporation was or was not for a business purpose it still came within the literal application of the law. It adhered to its own consistent holdings in that

respect, found direct authority for them in Hatfried Inc. v. Com'r, 3 Cir., 162 F.2d 628, and support in the rationalization of O'Sullivan Rubber Co. v. Com'r, 2 Cir., 120 F.2d 845, and Noteman v. Welch, 1 Cir., 108 F.2d 206.

The proofs in support of the petitioner's contention that it was organized for a business purpose, leave much to be desired and disclose some circumstances that are, to say the least, dubious in that connection. Its President, Frederick Smith, was undoubtedly its dominating spirit and a man of large interests. He was President of the National Toddle House Company and chairman of the Board for the Dixie Greyhound Lines. These enterprises occupied the same or adjoining offices and had a common secretary. Smith had a large income. Although the petitioner's articles of incorporation limit its activities to real estate, it became possessed of substantial amounts of stock in the other corporations. How it acquired them and from whom is not explained, and unexplained they suggest the "incorporated pocket-book" mechanism. Smith had been negotiating for the Matagorda Plantation for some time prior to the petitioner's incorporation. How the petitioner acquired this property, whether directly from the sellers or from Smith, is also not explained. The record is silent as to Smith's contribution to the capital stock of the petitioner, and whether it was paid in cash or property. While the lease of Matagorda was to a partnership rather than to Smith individually, it suggests inquiry as to whether the partnership was more formal than real, in view of its early dissolution by the cancellation of a large indebtedness from Moss to Smith. The petitioner's averment that it was organized for a business purpose and that its charter authorized such purpose, counts for nothing in the absence of proof, and real estate transactions subsequent to the tax years are unimportant in negating the status of the petitioner as a personal holding company in the tax years. If the petitioner was, in reality, a business corporation rather than one formed for the preservation and retention of investment income, adequate proof of that status could undoubtedly have been made. The fact that profit was expected from Matagorda is not conclusive. It may be assumed that gentlemen farmers and owners of racing stables may also expect to make a profit, or at least to break even.

■ In view of what we have said about the proofs, we do not meet the question so earnestly pressed upon us by the petitioner, and have no need to determine whether, in view of the asserted purpose of the Congress, §§ 502(f) and (g) should be interpreted in conflict with their plain meaning. We conclude that the Tax Court was not in error in sustaining the Commissioner's determination that the proceeds of the Matagorda lease were not to be included in the petitioner's computation of rents. The petitioner was therefore a personal holding company in 1937, and likewise in 1939 and 1940, unless a consideration of a number of subordinate questions requires a different conclusion in respect to the two later years.

■ Section 501(a) (1) provides that if a corporation is a personal holding with respect to any taxable year beginning after December 31, 1936, then for each subsequent taxable year the minimum percentage shall be 70% in lieu of 80% until circumstances appear as are not here involved. In 1939 the petitioner sold, at substantial profit, property known as the Dodd Plantation, upon an installment basis of which the initial payment was 24% of the selling price, with the remainder payable over a term of years. The petitioner, in 1939, elected to avail itself of the option permitted it by § 44(a), Title 26 U.S.C.A.Int.Rev. Code, by returning in the tax year as income only that proportion of the initial payment actually received in that year which the gross profit realized, bore to the total contract price. It now, however, seeks to include all of the profit in its gross income for 1939 so that its personal holding company income for that year will be less than 70% of its gross income. If it may do so it was not a personal holding company in 1939. It relies on Kimbrell's Home Furnishings v. Com'r, 4 Cir., 159 F.2d 608; Com'r v. Shenandoah Co., 5 Cir., 138 F.2d 792, and South Texas Lumber Co. v. Com'r, 5 Cir., 162 F. 2d 866. The Tax Court held that the personal holding company sections necessarily

require that comparable concepts of income tax accounting be employed, and sustained the Commissioner in rejecting the deferred profits in determining whether the 70% test applies. All doubt as to the soundness of this conclusion which might earlier have existed, is now resolved by the recent decision of the Supreme Court in Com'r v. South Texas Lumber Co., U.S., 68 S.Ct. 695. There it was held that a taxpayer may include in its equity invested capital only that portion of installment payments which it has actually received and on which it has already paid income taxes in the years of receipt. The appositeness of this holding to the present problem would appear to be completely demonstrated by the petitioner's reliance upon the Circuit Court of Appeals decision which was thereby reversed.

■ For the year 1940 the petitioner insisted that its rental income was understated and dividends overstated. In order to prevail it must succeed on both points. It sought to enlarge its rent item by interest received on the Dodd Plantation purchase money mortgage. Such interest, by virtue of § 502(g), may be included in rents to determine whether they make up 50% or more of gross income, but only if the debt which represents the price for which real property is sold or exchanged derives from the sale of property held primarily for sale to customers in the ordinary course of the taxpayer's trade or business. The Tax Court, however, found that during 1940 the petitioner had substantial income, none of which was attributable to the sale of real estate, that there was no income from such sales for succeeding years, and that for five years following the petitioner's incorporation, but two properties had been disposed of, only one of them by sale. It found it impossible, therefore, to escape the conclusion that the petitioner's dealings in real property were not in the ordinary course of its business, but were for preservation and retention for the receipt of investment income rather than the pursuit of profit from purchase and sale. These were findings of fact, based upon reasonable inferences drawn from evidence. They are binding upon us. It therefore becomes unnecessary to determine whether or not dividends were overstated for the year 1940.

The final question is whether the petitioner was entitled in 1940 to a dividends paid credit on a dividend declared in March, 1941, and paid by check on March 26, 1941. The statute, 26 U.S.C.A.Int.Rev.Code, § 504(c), permits a dividends paid credit for a given tax year if such dividends are paid after the close of the taxable year and before the 15th day of the third month of the following year. This dividend would have been allowable as a credit, if it had been paid by March 15.

■ The petitioner seeks to escape this limitation by showing that it adopted a resolution on March 3, for the payment of the dividend, and also by evidence that the stockholders were indebted to the corporation in excess of the dividend, so that the two obligations were set off against each other pro tanto as a matter of law, and proof that it had entered into an agreement with its stockholders to off-set their dividends against their accounts. The record fails to disclose evidence of such an agreement. No book entries were made reflecting it, and checks were issued on March 26 and delivered on that date, though they were then returned to the company to apply upon stockholders' accounts. The Tax Court rejected the contention in each of its aspects, and we agree.

■ The Treasury is not to be impeded in the collection of its taxes, by the necessity of auditing the accounts of a corporation with its stockholders, or searching for undisclosed agreements between them as to set-offs against dividends. This is akin to the principle that the Treasury cannot be compelled to decide when a possessor's claims to monies are without legal warrant. National City Bank v. Helvering, 2 Cir., 98 F.2d 93. In Founders General Corporation v. Hoey, 300 U.S. 268, 57 S.Ct. 457, 81 L.Ed 639, it was suggested that the taxpayer there might have attained his ultimate purpose by a form of transaction which would not have subjected him to a tax, but Mr. Justice Brandeis pointed out that even if true, this furnishes no reason for relieving him of a tax when, for whatever

reason, he chooses a mode of dealing within the terms of the Act. "To make the taxability of the transaction depend upon the determination whether there existed an alternative form which the statute did not tax would create burden and uncertainty." Grace periods are generally narrowly applied.

The decision of the Tax Court is affirmed.