**Iva R. CARY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Formerly Civ. No. 6–55.
Lincoln Division.**

United States District Court
D. Nebraska.
April 5, 1956.

R. R. Perry (of Perry, Perry & Nuernberger), Lincoln, Neb., for plaintiff.

Donald R. Ross, formerly U. S. Atty., and Harry W. Shackelford, U. S. Atty., Omaha, Neb., and Andrew D. Sharpe and Harlan Pomeroy, Attorneys, Department of Justice, Washington, D. C., for defendant.

DELEHANT, Chief Judge.

Plaintiff, the surviving wife of Kenneth B. Cary, also and generally known as K. B. Cary, deceased, brings this action to recover $398.57 (with interest thereon) allegedly paid by her and her late husband as excessive income tax upon their income for the taxable year 1950. Defendant denies that the tax paid was in excess of that by law required to be paid and that it is under any liability to plaintiff. The sum of $398.57· is the amount of income tax arising out of the inclusion in the taxpayers' gross income of the sum of $2,708.30 received by Mr. Cary from his employer during 1950 for an interval during which he was sick and unable to perform the duties of his employment.

No jurisdictional controversy is presented. Nor is there any question of computation of tax. If any sum is due to plaintiff it is the amount prayed for.

The case has been tried to the court without a jury. The evidence has been presented very largely by stipulation; but some additional material has been introduced through witnesses appearing personally in the trial. The facts are not seriously in dispute, although there is disagreement touching the conclusions to be drawn from some of them.

Throughout 1949 and 1950, Lincoln Telephone and Telegraph Company, hereinafter referred to as "the corporation" had in effect, and operated, a Plan for Employees' Pensions Disability Benefits and Death Benefits. That plan was administered, under and in pursuance of a written declaration or instrument adopted and promulgated, and from time to time revised, by the corporation, through a committee selected by, and serving dur-

ing the pleasure of, the corporation's board of directors. The following provisions are quoted from the plan:

"Section 3. Committee

"1) There shall be a Committee of five (5) or more appointed by the Board to serve during its pleasure, which Committee shall be called the Employees' Benefit Committee. This Committee shall be charged with the administration of the Plan.

"2) The Committee shall have the specific powers elsewhere herein granted to it and shall have such other powers as may be necessary in order to enable it to administer the Plan.

"3) It shall determine conclusively for all parties all questions arising in the administration of the Plan.

"4) It shall be empowered to authorize disbursements according to these Regulations.

"5) It shall adopt such By-Laws and rules of procedure as it may find necessary, subject to the approval of the President and subject to the provisions of Section 9 of these Regulations.

\* \* \* \* \* \*

"7) The expenses of the Committee in administering the plan shall be borne by the Company."

"Section 6. Sickness Disability Benefits.

"1) All employees of the Company shall, after a term of employment of two years, be qualified to receive payments under these Regulations on account of physical disability to work by reason of sickness. Such payments are hereinafter referred to as Sickness Disability Benefits. Such payments shall terminate when disability ceases and shall in no case extend beyond the periods hereinafter mentioned. For the purposes of these Regulations, sickness shall include injuries which are not compensable under the Nebraska Workmen's Compensation Law but shall not include sickness which is compensable under the Nebraska Workmen's Compensation Law.

"2) Beginning January 1, 1946, the sickness disability benefits in sickness disability cases originating on and after said date shall be as follows:

"a) If term of employment has been 2 to 5 years—full pay 4 weeks; half pay 9 weeks

"b) If term of employment has been 5 to 10 years—full pay 13 weeks; half pay 13 weeks

"c) If term of employment has been 10 to 15 years—full pay 13 weeks; half pay 39 weeks

"d) If term of employment has been 15 to 20 years—full pay 26 weeks; half pay 26 weeks

"e) If term of employment has been 20 to 25 years—full pay 39 weeks; half pay 13 weeks

"f) If term of employment has been 25 years or more—full pay 52 weeks

" 'Full pay' and 'half pay' for the purposes of this paragraph shall be based on the number of hours per week constituting the employee's normal service under his contract of hiring, not including overtime, and shall be computed at the employee's rate of pay at the time the disability began, provided, however, that the benefits shall at no time exceed the pay which the employee would receive, based on his rate of pay and the general schedule of hours per week constituting a full week's service at the time the disability began.

"3) Sickness disability benefits shall begin on the eighth calendar day of absence on account of disability, provided, however, that if an employee has received sickness disability benefits for any period and is again absent on account of sickness within two weeks after the termination of such period, any benefits on account of such further

sickness shall begin on the first day of absence instead of on the eighth day.

\* \* \* \* \* \*

"5) Employees shall not be entitled to receive sickness disability benefits for time for which any wages are paid them by the Company.

"6) All Sickness Disability Benefits shall be a charge to the operating expense accounts of the Company when and as paid."

"Section 8. General Provisions.

"1) Neither the action of the Board of Directors in establishing this plan for employees' pensions, disability benefits and death benefits, nor any action hereafter taken by the Board or the Committee shall be construed as giving to any officer, agent or employee a right to be retained in the service of the Company or any right or claim to any pension or other benefit or allowance after discharge from the service of the Company, unless the right to such pension or benefit has accrued prior to such discharge. Except in the event of termination of the Plan, no employee shall have any right to a service pension by reason of service less than that specified in Paragraphs 1(a) and 1(b) of Section 4 of these Regulations, nor any right in the Pension Fund unless a service pension authorized by the Committee under the Plan has not been paid, nor any right against the Company to any benefit under the Plan other than the amount to which the employee has theretofore become entitled and which the Committee has directed be paid to that employee under the Plan. In the event of termination of the Plan, no employee shall have any right in the Pension Fund or against the Company except as herein provided.

"2) Assignment of pensions or other benefits under these Regulations will not be permitted or recognized.

"3) In all questions relating to the term of employment and rates of pay of employees, the decision of the Committee, based upon these Regulations and upon the records of the Company, shall be final, provided, however, that as to service prior to June 1, 1917, the Committee shall have discretion to base its decisions upon the general intent of these Regulations and upon such information as may be obtainable from any source. As to service on or after June 1, 1917, this discretion shall not exist and the Committee shall base its decisions strictly upon the facts in the case as shown by the records of the Company.

"13) Payments under the Plan shall be made in conformity with the financial methods of the Company and on orders of or bills prepared by the Committee or such other persons as may be designated by the Committee.

"14) Disability benefits will ordinarily be paid at the same intervals of time as would govern the payment of wages to the employee if he were in the performance of duty, but at the discretion of the Committee benefits on account of continued disability may be paid monthly and on account of disability for short periods when the amounts are ascertained.

\* \* \* \* \* \*

"Section 10. Changes in Plan.

"The Committee, subject to the provisions of Section 9, with the consent of the President and subject to the approval of the Board of Directors, may from time to time make changes in the plan set forth in these Regulations, and the Company may terminate said Plan, but such changes or termination shall not affect the rights of any employee, without his consent, to any benefit or pension to which he may have previously become entitled hereunder. \* \* \*"

The corporation, at least since 1930, has continuously explained to each of its

employees at the inception of employment its so-called plan for employees' pensions, disability benefits and death benefits and has provided each such employee with a "kit" giving information upon the plan and also a pamphlet copy of it. K. B. Cary's duties were such that he was informed of, and in fact gave to other employees instructions concerning, the plan.

K. B. Cary was an employee of the corporation for thirty-seven years two months next prior to his death. The period of his employment included all of the years 1949 and 1950. From 1930 until his death he held the position of District Commercial Manager of the corporation and, therefore, served it in an executive capacity. Through 1949 his salary was $541.66 per month. Beginning January 1, 1950, his monthly salary was $575.

From December 12, 1949, through May 31, 1950, K. B. Cary was continuously absent from work on account of an illness which was diagnosed as a coronary occlusion.

On December 27, 1949, the following entry appears in the minute book of the corporation's benefit committee:

"Meeting of the Benefit Committee Was Held in the Office of the Vice President, December 27, 1949, All Members Being Present.

\* \* \* \* \* \*

"Sickness case No. 2440—K. B. Cary, Lincoln. Moved, seconded and carried that full pay at $541.66 per month from December 19, 1949, to end of disability or return to regular duties but not to extend beyond December 17, 1950, be allowed and charged against appropriate expense accounts."

In the corporation's schedules of various benefits to employees preserved in its minute books, its disbursements on account of "sickness disability benefits" were characterized as wages. Thus, for the month of March, 1950, its memorandum touching payment to Mr. Cary is in the following words and figures "3926 K. B. Cary, Lincoln, wages $580.80"

The corporation on its employee's pay roll record for the period ending January 15, 1950, in its sickness disability department, made the following record concerning Mr. Cary:

| "Name | Position | Classification Account: | Amt. | Deductions |
|---|---|---|---|---|
| K. B. Cary | Lincoln Executive | 672–32 | 580.80 | Payroll correction 3.90–Other 35.23 |

| Nature of Disbursement | Rate | Total earned | Acct. Dep. use only |
|---|---|---|---|
| Sickness Disability | 541.66 per mo. | 541.66 | N.T. " |

(The original payroll record shows the material just quoted in two lines instead of four. The first line of the payroll record consists of columnar headings and the second line of specific entries thereunder. The abbreviation N.T. means "nontaxable" and has reference to social security tax.)

For the year 1950 plaintiff and K. B. Cary, as wife and husband, as "taxpayer" filed a joint federal income tax return in which, among other things, they reported the following:

"(2) Enter your total wages, salaries, bonuses, commissions, and other compensation received in 1950, Before Payroll Deductions for

taxes, dues, insurance, bonds, etc. Also enter amount of income tax withheld. Members of Armed Forces and persons claiming traveling or reimbursed expenses, see Instructions.

Your

| Print Employer's name | Where Employed (City & State) | Amount of Income Tax Withheld | Total Wages |
|---|---|---|---|
| Income | | | |
| Lincoln Tel. and Tel. Co. | Lincoln, Nebr. | | |
| | | $831.00 | $6533.26 |
| Enter Totals | | | |
| | | $831.00 | $6533.26 |

(3) If you received dividends, interest, or any other income, give details on page 2 and enter the total here
................................................ 270.24

(4) Add income shown in items 2 and 3, and enter the total here................................................6803.50"

Included in both the reported total wages of $6,533.26 and total income of $6,803.50 mentioned in the quotation in the preceding paragraph was the sum of $2,708.30 paid to K. B. Cary by the corporation under the foregoing sickness disability plan during the interval when, in consequence of illness, he was not working. That was the amount so paid. The income tax on that sum of $2,708.30 had been withheld by the corporation and by it paid to the Collector of Internal Revenue.

The corporation is, and throughout 1949 and 1950 was, engaged in operating a telephone system and supplying telephone service to patrons and the public generally. It then was, and still is incorporated under the laws of Delaware and domesticated under the laws of Nebraska.

The corporation is not incorporated or licensed as an insurance company and is not licensed by the state of Nebraska to write or issue accident, health or disability insurance as an insurance carrier, and has never assumed to engage in the business of providing or writing insurance. It has never paid to the State of Nebraska an insurance premium tax.

The corporation does not set aside any special fund for the maintenance or operation of the plan. Nor does it maintain any reserve in its books for the servicing of the plan.

No independent organization administers the plan. It is not insured or reinsured by the corporation through any insurance instrumentality.

However, the corporation does have in effect a retirement plan with a fund erected for its operation. This retirement plan is administered by a New York City trust company. The corporation regularly contributes to the retirement fund on an actuarial basis.

No medical or physical examination is required as a prerequisite to coverage under the sickness disability plan. It will be observed, however, in this connection that no sickness disability benefits arise until after an employee has been in the corporation's service for two years. Nor is any application for such coverage or for benefits under it provided or required.

During the interval of his receipt of benefits under the plan, K. B. Cary received a single pay check towards the end of each month covering the payment for that month. Included in that check for a month when he worked a part of the time was pay both for time actually worked and for time when he was receiving sickness benefits under the plan. Payments under the plan, as also payments

for wages earned, are charged to operating expenses.

Essentially, the payments to K. B. Cary under the plan were by the corporation treated in the manner of paid sick leave. They were in the full amount of his salary as of the onset of his disability, and were treated as full pay, as wages or compensation earned. The corporation, except for the computation of social security taxes and its own accounting, made no essential distinction between sickness disability payments under the plan and salary or wages earned during actual work. Payments of sickness disability benefits under the plan were charged as operating expenses and listed as payroll cost items.

From the payments of sickness disability benefits under the plan the corporation made payroll deductions for insurance premiums, the purchase of United States bonds and contributions to the credit association.

No persons but employees of the corporation are entitled to any benefits under the plan. However, no employee contributes anything to the cost of the plan, which is borne entirely by the corporation.

The committee for the management of the plan is appointed in actual operation by the corporation's board of directors from its executives and department heads. It holds regular weekly meetings each requiring from one and one-half hours to two hours and also occasional special meetings. Its members perform the work of this committee assignment along with the general duties of their respective positions with the corporation.

The payments aggregating $2,708.03, supra, were not required by, or paid or received under, workmen's compensation acts or employer's liability laws.

Plaintiff filed a timely claim for refund of the income tax now sued for on the ground that the corporation had improperly withheld income taxes on the amount of $2,708.30 paid to K. B. Cary under the sickness disability plan and that said amount was "exempt from taxation under the Internal Revenue Code, Section 22(b) (5)" as being received "under a health insurance plan".

What has to be decided is whether the sickness disability payments received by K. B. Cary in the calendar year 1950 in the total sum of $2,708.30 constituted taxable income. Both parties recognize that they are thus taxable unless they are within the reach of the exclusion defined in Title 26 U.S.C. § 22(b) (5), being Section 22(b) (5) of the Internal Revenue Act of 1939, as amended. The material portion of the statute follows:

"(b) *Exclusions from gross income.* The following items shall not be included in gross income and shall be exempt from taxation under this chapter:

\* \* \* \* \* \*

"(5) *Compensation for injuries or sickness.* Except in the case of amounts attributable to (and not in excess of) deductions allowed under section 23(x) in any prior taxable year, *amounts received through* accident or *health insurance* or under workmen's compensation acts, *as compensation for* personal injuries or *sickness,* plus the amount of any damages received whether by suit or agreement on account of such injuries or sickness, and amounts received as a pension, annuity, or similar allowance for personal injuries or sickness resulting from active service in the armed forces of any country."

(The italicizing in the foregoing quotation has been supplied. It will also be noted that the reference to deductions under section 23(x) is presently insignificant. It has to do with a provision for the deduction of expenses for medical or dental care in some circumstances and with certain restrictions.)

While counsel on both sides of the controversy advance certain reported opinions in support of their respective positions, it is quite true that there is no such uniformity or preponderance in published judicial application of the

quoted language of the statute as to amount to authority in any practical sense. The courts have disagreed upon the subject and it seems not to have been determined squarely either by the Supreme Court or by the Court of Appeals for the Eighth Circuit.

 It is the considered opinion of this court that on the record plaintiff has failed to make out her claim to the exemption she asserts. This conclusion rests upon the conviction that K. B. Cary's receipts from sick benefits were not, within the statute's language and meaning, "amounts received through * * * health insurance for * * * sickness". What the statute exempts from taxation is amounts received through health insurance, not amounts received through a program that possesses some, even many, of the characteristics of health insurance.

Plaintiff relies especially on the case of Epmeier v. United States, 7 Cir., 199 F.2d 508. In fact, she cited that opinion in her claim for refund as the ground of the claim. That the cited case tends to support her claim is readily recognized. It occurs to this court, however, that the writer of that opinion placed noticeable emphasis upon certain factors that are not present in the instant case. These include (a) the circumstance that Epmeier's employer was Lincoln National Life Insurance Company, a corporation principally engaged in the insurance business, which had authority to and did engage in the business of providing health insurance; (b) the requirement of an employee's medical examination, on the results of which the right to sickness benefits (though not necessarily to employment) was made to depend; and (c) a system of checks substantially comparable to those found in a health insurance policy, formulated, no doubt, on the basis of that employer's actual engagement in the insurance field. This court does not regard the opinion's emphasis upon the employer's character as an insurer as vital to the conclusion at which it arrives and thinks that the same result would have been reached if that factor were absent. The opinion, none the less, places some emphasis upon it. With observable brevity and inadequate discussion, it appears to conclude that the plan before it was health insurance, because, for a consideration found to exist in the employee's labor, the employer undertook to indemnify the employee, through a specified period of time, against loss from the hazard of disabling sickness. It is the writer's thought that the opinion fails adequately to analyze the significance of health insurance and considers and acts upon only a few of its factors.

Probably more directly in point favorable to plaintiff are the findings of fact and conclusions of law, published as Herbkersman v. United States, D.C.Ohio, 133 F.Supp. 495. That is not an opinion in the strict sense of the term, but it does reflect a view in harmony with, and perhaps proceeding beyond, the Epmeier case. Unlike the Epmeier litigation, it did not arise out of payments by an insurance corporation employer. In fact, the employer in it was American Telephone and Telegraph Company which administered an employees' benefit program very similar to the one presently involved. One may with reason suppose that they came from a common source. And the trial judge in the Herbkersman case held that the sickness benefits there involved were received through health insurance. His conclusions directly support the present plaintiff's position in an indistinguishable setting.

Both parties in this action draw to the court's attention the treatment of the subject in the Internal Revenue Code of 1954, 26 U.S.C.A. Section 105(d) of that code is directly cited, although its understanding is facilitated by reading it in relation to all of sections 104, 105 and 106. Naturally, the litigants differ widely in their conclusions from Section 105 (d). Section 105(d) is in the following language:

"(d) Wage continuation plans.— Gross income does not include amounts referred to in subsection (a) if such amounts constitute wages or payments in lieu of wages for

a period during which the employee is absent from work on account of personal injuries or sickness; but this subsection shall not apply to the extent that such amounts exceed a weekly rate of $100. In the case of a period during which the employee is absent from work on account of sickness, the preceding sentence shall not apply to amounts attributable to the first 7 calendar days in such period unless the employee is hospitalized on account of sickness for at least one day during such period. If such amounts are not paid on the basis of a weekly pay period, the Secretary or his delegate shall by regulations prescribe the method of determining the weekly rate at which such amounts are paid."

Counsel for plaintiff argues in his brief that by the foregoing language "Congress has clarified its recognition of the equities in favor of plaintiff's position in providing for the exclusion of payments under wage continuation plans from net income up to $100.00 per week". "Clarified" is the key word in that excerpted clause. Defendant, on the contrary, argues that the cited section is truly amendatory, not merely clarifying in character and by reasonable inference recognizes the total absence theretofore of the exclusion from gross income by it provided for.

■ This court is of the opinion that defendant is on the more solid ground. As a general principle of statutory construction, it is presumed that a legislative body, in modifying a statute, intends to make a change in existing law. United States v. Bashaw, 152 U.S. 436, 14 S.Ct. 638, 38 L.Ed. 505; Mogis v. Lyman-Richey Sand & Gravel Corporation, 8 Cir., 189 F.2d 130, certiorari denied 342 U.S. 877, 72 S.Ct. 168, 96 L.Ed. 659; Essex Storage Electric Co. v. Victory Lumber Co., 95 Vt. 117, 112 A. 832; People v. City, etc., of Denver, 84 Colo. 576, 272 P. 629; State ex rel. Maryland Casualty Co. v. District Court, 134 Minn. 131, 158 N.W. 798; State ex rel. Davis v. Farmers' State Bank, 112 Neb. 597, 200

N.W. 173. Though not at all controlling, it is not wholly without significance, that when, in 1954, the Congress formally introduced into the Act the exclusion of amounts received under a wage continuation plan during disabling illness it limited the amount of weekly receipts thus excluded, and imposed no like limitation in connection with receipts from accident or health insurance thus designated. Instructive, also, upon the significance of the quoted section is its pertinent legislative history. See U.S.Code Congressional and Administrative News, Volume 3, 83d Congress, Second Session 1954, pp. 4168 to 4170, inclusive. And there is some force in an argument of defendant, touching the analogy in the modification of the treatment of amounts received under a life insurance contract as between Section 22(b) of the Act, and its amendment by Section 302, Revenue Act of 1951, 65 Statutes at Large 452 et seq.

■ The court is persuaded that in its reference to "health insurance"—especially in its bracketing of "accident and health insurance"—in Title 26 U.S.C. § 22(b) (5), the Congress meant to identify health insurance in the sense in which people commonly understand it. Helvering v. LeGierse, 312 U.S. 531, 61 S.Ct. 646, 85 L.Ed. 996; Crane v. Commissioner, 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301; Helvering v. Tyler, 8 Cir., 111 F.2d 422; Commissioner v. Treganowan, 2 Cir., 183 F.2d 288, certiorari denied 340 U.S. 853, 71 S.Ct. 82, 95 L.Ed. 625; Waller v. United States, 86 U.S.App.D.C. 93, 180 F.2d 194, 16 A.L.R.2d 1328; Moholy v. United States, D.C.Cal., 132 F.Supp. 32.

■■ It has to be remembered, too, that statutory provisions for exemption or exclusion from liability for income taxes are construed strictly and that he who claims the benefit of one of them carries the burden of establishing the right he seeks. Helvering v. Northwest Steel Rolling Mills, Inc., 311 U.S. 46, 61 S.Ct. 109, 85 L.Ed. 29; Bowers v. Lawyers Mortgage Co., 285 U.S. 182, 52 S.Ct. 350, 76 L.Ed. 690; Frederick Smith Enterprise Co. v. Commissioner, 6 Cir., 167 F.2d 356.

Cited by defendant are two reported opinions of district courts in which the position of defendant is broadly supported. Moholy v. United States, supra, and Branham v. United States, D.C.Ky., 136 F.Supp. 342. (The court understands that both of those cases are pending upon appeal, and that either or both of them may yet be reversed.) The two opinions can not be distinguished in principle from the present case, and that is true though the Moholy case concerned sick leave pay received by a city fireman under a statutorily allowable municipal program. In that case [132 F.Supp. 33] the trial court emphasized the essentiality to excludability that the amounts involved be received through "health insurance", rather than from some program "like health insurance", and also distinguished the Epmeier case, supra. In the Branham opinion, emphasis is placed upon the voluntary character of the program there involved and the absence of any diffusion through the beneficiaries of the cost of the program which was borne, as here, solely by the employer.

The court has concluded that it is not dealing with moneys received through health insurance. And that conclusion compels the denial of the relief sought by plaintiff and the dismissal of the action. It is convinced that the Epmeier and Herbkersman cases were both decided upon a mistaken premise. There is, to be sure, no question but that in some respects the programs examined in those cases had, as does that of the present corporation, some characteristics of health insurance. In a sense, though not strictly, they contemplated a risk, namely the possibility of loss of earnings during disabling illness, and within their respective limitations provided relief from it. This court encounters no difficulty in finding a consideration in the employees' work, although it is satisfied that the employers and their respective employees never carried their thinking to that extremity. But about there the analogy with insurance ends. The several programs are voluntary and unilaterally terminable, with a reservation, of course, in favor of matured claims. There is no distribution of the cost of any such program among the potential beneficiaries of it. The provider of the benefits is not a lawfully qualified insurance instrumentality, making due allowance, of course, in the Epmeier case. There is no effort to comply with state laws that govern the business of insurance or to contribute to the revenue of the state which arises from the insurance business. The simple truth is that there is no insurance. The writer hereof is quite sure that the corporation would be surprised to learn that it has been engaging in the health insurance business, and that K. B. Cary never considered that he was beneficiary of a health insurance contract with his employer as the insurer. What the corporation provides is a limited wage stabilization program, that costs it a substantial amount of money in each year's experience but repays the expense in the way of employee loyalty and improved labor relations within its organization.

The court has not been moved to its decision by evidence of an insurance expert challenging the economic congruity with health insurance practices of the plan of the corporation. It may be granted, and is undoubtedly true, that a well managed health insurance company would decline to issue policies providing the benefits set up in the plan, even through a short period of time, or to underwrite a corporate employer's plan of that character. The guaranty to an insured of his full wage during illness, though for brief periods, almost inevitably encounters economic and moral obstacles. But that does not itself prevent the plan from being a health insurance program. It extends no farther than the interposition of a factor arguing against the likelihood that such a plan would be set up as an insurance enterprise. Despite its improvidence and unwisdom, as an insurance measure, it could be undertaken.

An order of dismissal is being made and given.