618

W. A. ADAMS and Elsie S. Adams,
Plaintiffs,

v.

R. C. PITTS, Director of Internal Revenue for the District of South Carolina, Defendant.

Civ. A. No. 4605.

United States District Court
E. D. South Carolina,
Columbia Division.

April 25, 1956.

E. Ellison Walker, Columbia, S. C., for plaintiffs.

N. Welch Morrisette, Jr., U. S. Atty., Irvine F. Belser, Jr., Asst. U. S. Atty., Columbia, S. C., Charles K. Rice, Asst. Atty. Gen., Andrew D. Sharpe, Robert E. Manuel, Attys., Dept. of Justice, Washington, D. C., for defendant.

TIMMERMAN, Chief Judge.

This is a suit to recover the amount of an alleged overpayment of income taxes with interest. The plaintiff W. A. Adams (hereafter referred to simply as "plaintiff") is an employee of Southern Bell Telephone and Telegraph Company (hereafter referred to as "Southern Bell" or as "the company") and has been so employed since September 1, 1936. The defendant is the District Director of Internal Revenue of South Carolina. For the most part, the facts are stipulated.

In the year 1952, from July 23 through December 31, plaintiff was absent from work because of an operation performed on the lower part of his back. Southern Bell continued to pay him, during the period of his absence, an amount equal to his regular salary pursuant to the terms of a plan which the company had for its employees, comprehending pensions, disability benefits and death benefits. The total amount so paid him was $2,481.56. On February 12, 1953, plaintiff and his wife filed a joint Federal Income Tax Return for the year 1952, reporting thereon a net income of $5,080.10 and a tax liability of $594.98. The amount of the tax was paid to the gov-

ernment. On February 25, 1954, plaintiff filed a claim for a refund of income taxes in the amount of $492.92 for the year 1952, upon the ground that $2,481.-56 in sickness disability benefits received from Southern Bell was erroneously reported as salary. Plaintiff contended that such benefits were exempt income under Section 22(b) (5) of the Internal Revenue Code of 1939, 26 U.S.C.A. This claim was disallowed by statutory notice dated September 20, 1954.

The plan under which plaintiff received the benefits in issue is set forth in terms of company regulations. The plan provides, among other things, that all employees of more than two years service shall be qualified to receive sickness and disability benefit payments. Approximately 60,000 employees of Southern Bell are covered by the plan. The benefits range from full pay for 4 weeks and half pay thereafter for 9 weeks for an employee with two to five years of service, to full pay for 52 weeks for an employee with twenty-five years of service. Benefit payments under the plan generally begin with the eighth calendar day of absence. The plan is administered by a general committee of five members appointed by and serving during the pleasure of the board of directors. It is responsible to the board and to the President of the company. The committee members are the operating heads of the various departments of the company. A majority of their time is devoted to other company affairs with about three hours a week devoted to committee work. Similarly constituted committees administer the plan in each of the nine states in which Southern Bell does business. All employees of the company except those who have worked for less than two years are covered by the plan. The highest salaried employee receives in excess of $60,000.00 per year. Employees are not required either to take a physical examination or to submit applications in order to become eligible to receive benefits. Benefits are not payable during a period of lay-off, and, except for rights which have matured prior to discharge,

no employee receives benefits after his discharge. No persons other than employees of the company are covered under the plan. No contribution is made by the employees other than their services for the benefits received under the plan. When an employee is absent on account of sickness, the secretary of the appropriate state committee authorizes payment of the sickness or disability benefits subject to later approval or ratification by the general committee. The committee is authorized by the board of directors to approve payments to employees in excess of the payments provided for in the plan; such payments are made in needy cases. In addition, the committee makes loans to the employees from time to time. It may, in its discretion, authorize payment of accrued but unpaid benefits to a deceased employee's dependents. Employees are paid their regular salaries during the first seven days of absence on account of illness and are paid under the plan during subsequent weeks of absence on account of illness, provided the prescribed conditions therefor exist. On the company's payroll records, sickness and disability benefits, whether paid for the first week of absence or for later weeks under the plan, are treated alike and listed under sickness disability payments. When an employee receives payment for time actually at work as well as for sickness or disability benefits during a single biweekly pay period, he generally receives a single check. If he works a portion of a day and is entitled to sickness or disability benefits under the plan for the remainder of the day, his salary for the entire day is charged to his regular salary account for that particular day. Disability benefit payments, whether made under the plan or not, are charged to operating expenses. There is no fund from which disability benefit payments are made, and there is no independent trust or association which administers the disability benefit provisions except the committee of employees. No reserve is set up on the company's books against which disability benefit payments are charged.

The cost of sickness benefits is not determined on an actuarial basis. Although the disability benefit provisions of the plan have been in effect since 1913, the company has never been sued for sickness disability benefits under the plan.

Southern Bell is not licensed by the State of South Carolina to engage in the business of health insurance. It is not the practice of insurance companies to insure an individual under a health insurance policy for more than eighty per cent of his salary. In the case of group insurance, the limitation is usually about two-thirds of the employees' salaries. It is not the practice of insurance companies to issue health insurance policies where the period of time during which benefits are paid depend upon the length of time during which the insured has held a particular job.

The question for determination is whether or not the payments received by plaintiff from Southern Bell under its plan for employees' pensions, disability benefits and death benefits should be excluded from plaintiff's taxable income for the year 1952.

Section 22(b), Internal Revenue Code of 1939, as amended by Sections 113 and 127, Internal Revenue Act of 1942, ch. 619, 56 Stat. 798, provides:

"(b) *Exclusions from gross income.* The following items shall not be included in gross income and shall be exempt from taxation under this chapter:

\* \* \* \* \*

"(5) *Compensation for injuries or sickness.* \* \* \* *amounts received through accident or health insurance* or under workmen's compensation acts, *as compensation for personal injuries or sickness,* plus the amount of any damages received whether by suit or agreement on account of such injuries or sickness, and amounts received as a pension, annuity, or similar allowance for personal injuries or sickness resulting from active service in the armed forces of any country." (Emphasis added.)

Thus, more narrowly, the question involved is whether or not the plan maintained by Southern Bell may be properly characterized as "accident or health insurance" within the meaning of the cited section. Certainly, the plan has all the characteristics of insurance. For a consideration, the company has undertaken to indemnify its employees against a contingent loss of earnings through sickness or other disability. The consideration consists of the services as well as the increased efficiency of its employees resulting from a better morale. Essentially, the only distinction between this plan and a commercial type of insurance is that instead of paying premiums to an insurance company, Southern Bell assumes the risk of loss itself and thereby assumes the role of insurer as well as employer. But such an arrangement is not unusual, especially since the passage by various States of Workmen's Compensation Acts. Such an arrangement certainly does not destroy the effect of the program, and surely it makes no difference to the employee, so long as he is certain of collecting benefits when a proper occasion arises, whether the benefits are paid by an insurance company or by the employer himself.

The fact that Southern Bell is not engaged in a general insurance business seems immaterial, since, in fact, it does insure its employees. Moreover, the fact that regular insurance companies do not make it a practice to provide 100% coverage is no reason to say that Southern Bell's plan is not insurance; nor is it essential that Southern Bell should adopt the policies and cash rates of regular insurance companies. The truth is that Southern Bell probably found that it could provide greater benefits for its employees at a lower cost to the company by self-insuring the plan; and with 60,000 employees, the distribution of risk was great enough to make the plan feasible.

Decisions holding that benefits similar to the ones here involved are excludable

from taxable income under Section 22(b) (5) are: Epmeier v. United States, 7 Cir., 1952, 199 F.2d 508; Herbkersman v. United States, D.C.S.D.Ohio 1955, 133 F.Supp. 495; and Haynes v. United States, D.C.N.D.Ga.1955, 139 F.Supp. 671. Decisions to the contrary are: Branham v. United States, D.C.W.D.Ky. 1955, 136 F.Supp. 342; Oliva v. Commissioner of Internal Revenue, 1956, —— T.C. ——; Cary v. United States, D.C. D.Neb.1956, 141 F.Supp. 750; and possibly Moholy v. United States, D.C.N.D. Cal.1955, 132 F.Supp. 32. (Many of these decisions are no doubt being appealed.)

In the last cited cases, much significance is attached to the fact that the employer is not in the business of insuring risks. How that makes any difference, so far as the employee is concerned, is hard to see. After all, it is the employee for whose benefit Section 22(b) (5) was enacted. Surely, in enacting it, Congress was not trying to promote the business of regular insurance companies at the expense of employees of companies ready, willing, and financially able to provide insurance programs themselves.

In Epmeier v. United States, supra, it was stated:

"* * * The provisions of Section 22(b) (5) undoubtedly were intended to relieve a taxpayer who has the misfortune to become ill or injured, of the necessity of paying income tax upon insurance benefits received to combat the ravages of disease or accident.

"As we have indicated, we know of no reason why this insurance, when provided as a part of the contract of employment between employee and employer, must follow any stereotyped or conventional form. Surely there is no legal magic in form; the essence of the arrangement must determine its legal character. We conclude that the fact that there is no formal contract of insurance is immaterial, if it is clear, as here, that, for an adequate consideration, the company has agreed and has become liable to pay and has paid sickness benefits based upon a reasonable plan of protection of its employees." 199 F.2d at page 511.

In the foregoing case, plaintiff's employer happened to be an insurance company, but the Court's opinion clearly indicates that the result would have been the same regardless of that fact. The point made was that so long as the plan is in its nature insurance, the form of the plan is immaterial.

■■ In the Oliva and Cary decisions, supra, in holding benefits similar to the ones here before the Court to be taxable, the Courts based their decisions in part upon the proposition that the taxpayer has the burden of bringing himself within the terms of a statutory provision for an exemption or exclusion. Both opinions admit, perhaps tacitly, that the provision in question is capable of two constructions and that one of the two constructions would be unfair and discriminatory. Both Courts then adopted the unfair and discriminatory construction. With this, I disagree. It should not be presumed that Congress intended to enact an unfair and discriminatory statute unless the statute clearly requires such a construction. The fact that one of two alternative constructions would be fair and just is sufficient reason to adopt that construction. This undoubtedly was the thought of the Court in the Epmeier case, and I am fully in accord with it.

It is interesting to note that the problem here will not arise under the Internal Revenue Code of 1954. Subsection (e) of Section 105 of the new Code expressly provides that, "* * * amounts received under an accident or health plan for employees * * * shall be treated as amounts received through accident or health insurance." This express language reflects Congress' recognition of the inequity of the Commissioner's construction of Section 22(b) (5) of the old Code.

■ Time after time, in litigation over income taxes, the government has,

with remarkable success, maintained that the Income Tax Law should be construed realistically. "Substance, not form" has been its argument. Now, the shoe is on the other foot, and the government wishes to choose form in preference to substance.

An order of judgment for the plaintiffs will be signed upon presentation.